UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| SHERRY L. RUFF,<br><br>       Plaintiff,<br><br>  vs.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner of the Social Security<br>Administration,<br><br>       Defendant. | 4:18-CV-04057-VLD<br><br><br>MEMORANDUM OPINION<br>AND ORDER |

## INTRODUCTION

Plaintiff, Sherry L. Ruff, seeks judicial review of the Commissioner's final

decision denying her application for social security disability and supplemental

security income disability benefits under Title II and Title XVI of the Social

Security Act.[1]

_____

[1]SSI benefits are called "Title XVI" benefits, and SSD/DIB benefits are called
"Title II" benefits. Receipt of both forms of benefits is dependent upon whether
the claimant is disabled. The definition of disability is the same under both
Titles. The difference--greatly simplified--is that a claimant's entitlement to
SSD/DIB benefits is dependent upon one's "coverage" status (calculated
according to one's earning history), and the amount of benefits are likewise
calculated according to a formula using the claimant's earning history. There
are no such "coverage" requirements for SSI benefits, but the potential amount
of SSI benefits is uniform and set by statute, dependent upon the claimant's
financial situation, and reduced by the claimant's earnings, if any. There are
corresponding and usually identical regulations for each type of benefit. See
e.g. 20 C.F.R. §§ 404.1520 and 416.920 (evaluation of disability using the five-
step procedure under Title II and Title XVI). Ms. Ruff filed her application for
both types of benefits. AR115, 250, 257, 299. Her coverage status for SSD
benefits expired on June 30, 2018. AR14. In other words, in order to be

Ms. Ruff has filed a complaint and has made a motion to reverse the Commissioner's final decision denying her disability benefits and to enter an order awarding benefits.  <u>See</u> Docket No. 14.  Alternatively, Ms. Ruff requests the court remand the matter to the Social Security Administration for further proceedings.  <u>Id.</u>  The Commissioner resists Ms. Ruff's motion.  <u>See</u> Docket No. 17.

This appeal of the Commissioner's final decision denying benefits is properly before the court pursuant to 42 U.S.C. § 405(g).  The parties have consented to this magistrate judge handling this matter pursuant to 28 U.S.C. § 636(c).

## FACTS[2]

### A.  Statement of the Case

This action arises from plaintiff, Sherry L. Ruff's, ("Ms. Ruff"), application for SSDI and SSI filed on November 3, 2014, alleging disability since July 22, 2012, due to seizures, right ankle injury, anxiety and depression.  AR115, 250, 257, 299 (citations to the appeal record will be cited by "AR" followed by the page or pages).  Prior to the ALJ hearing Ms. Ruff also identified medical issues with her shoulder, neck, and back, as well as problems with her balance.  AR367.

---

entitled to Title II benefits, Ms. Ruff must prove disability on or before that date.

[2] These facts are gleaned from the parties' stipulated statement of facts (Docket 13).  The court has made only minor grammatical and stylistic changes.

Ms. Ruff's claim was denied initially and upon reconsideration. AR171 179, 184. Ms. Ruff then requested an administrative hearing. AR193. Ms. Ruff's hearing was held on April 4, 2017, by Administrative Law Judge ("ALJ") Kristi Bellamy. AR89. Ms. Ruff was represented by other counsel at the hearing, and an unfavorable decision was issued on May 22, 2017. AR8, 89.

**B.    Plaintiff's Age, Education and Work Experience.**

Ms. Ruff was born in April of 1965 and completed LPN training in 1985, and one year of college in 2005. AR300. Ms. Ruff was 52 years old on the date of the ALJ's decision. AR8, 300. The ALJ identified Ms. Ruff's past relevant work as date entry clerk. AR22.

**C.    Relevant Medical Evidence.**

**1.    Sanford Family Medicine Clinic & Sanford Neurology Clinic**

Ms. Ruff was seen by Dr. DeHaan on September 16, 2011, for her anxiety which had been somewhat controlled, but still having issues. AR688. She reported that her anxiety symptoms included insomnia, racing thoughts psychomotor agitation, feelings of losing control, and difficulty concentrating. AR688. She also said she had depression symptoms including depressed mood. AR688. Her medications included clonazepam and citalopram. AR688. On examination, her grooming was good and her reasoning and speech pattern and content were normal. AR689. Ms. Ruff's gait was normal, her sensation was grossly intact and her reflexes were normal and symmetric. AR689.

Dr. DeHaan assessed that Ms. Ruff's depression and anxiety were "stable." AR689.

Ms. Ruff was in an automobile accident on July 22, 2012, in which she apparently had a seizure and ran into a telephone pole. AR649, 664, 672. X-rays obtained on July 22, 2012, revealed a complex fracture dislocation of the right ankle. AR798. A CT of the right ankle was obtained on July 23, 2012, and revealed an impaction type fracture involving the talar head-neck with extension to the talonavicular joint, with additional fractures in the medial process, anterior process, the tibia, the inferolateral cuboid, the os trigonum, and multiple loose bodies associated with the multiple fractures and marked soft issue edema. AR772.

On July 22, 2012, following the open fracture to her right ankle Ms. Ruff had an irrigation and debridement of the right ankle with application of external fixator. AR679, 685. The external fixator was removed by Dr. Alvine on July 25, 2012, and the talonavicular joint and subtalar joint of Ms. Ruff's right ankle were pinned in an essentially anatomic position. AR680. Dr. Alvine noted that the CT findings also showed an impaction of the medial talar head that "may give long-term problems with arthritis. ..." AR680.

A cervical spine MRI obtained on July 23, 2012, revealed "at the C6-7 level, there is mild central disk protrusion present. This effaces the thecal sac without evidence of spinal stenosis or neural foraminal stenosis." AR674, 755.

An electroencephalogram (EEG) was obtained on July 23, 2012, due to seizure-like movements following an automobile accident with three more

seizure-like episodes.  AR744.  The EEG was abnormal with occasional sharp waves indicative of cortical irritability with a tendency to have seizures.  AR744.

Ms. Ruff was discharged on July 25, 2012, to the rehab unit, but was non-weight bearing on her right foot and Dr. Alvine felt she would be in too much pain to walk.  AR664.  By August 3, 2012, Ms. Ruff was able to ambulate 50 feet with weight bearing, but was not yet able to handle steps and was discharged home.  AR618, 636.

By September 25, 2012, Ms. Ruff continued to report severe pain in her leg following surgery to remove the previously placed pins in her ankle.  AR599.  She contacted Dr. DeHaan's office about refilling her Tramadol, which didn't help with the pain completely, but helped take the edge off.  AR599.

Ms. Ruff was seen at the neurology clinic on September 27, 2012, to follow-up on her seizures.  AR595. The neurologist concluded that her history of seizure-like activity previously and abnormal EEG were convincing enough for seizures, so he continued her on Keppra, and informed her of the possible side effect of depression.  AR596.  The neurologist also stopped her Tramadol because she was already taking Celexa for depression and the two together can cause seizures.  AR596.  The neurologist's assessment was epilepsy: focal vs. generalized.  AR598.  On examination, Ms. Ruff was oriented, her memory and fluency repetition were intact, her concentration, attention, and language with naming were normal, and her fund of knowledge was good.  AR597.  She had

5/5 strength in her upper and lower extremities and her gait examination was normal. AR597.

Ms. Ruff saw Dr. DeHaan on October 1, 2012, to follow-up after her accident and hospitalization. AR594. She said that she continued to have severe pain and was unable to bear weight on her right foot. AR594. She had just been seen by Dr. Alvine who was concerned about development of reflex sympathy dystrophy ("RSD"). AR594. Ms. Ruff said that she was having difficulty sleeping and was very depressed, frustrated and uncomfortable. AR594. She said she was also having significant anxiety and her clonidine level had been adjusted. AR594. Examination showed she was tearful, in a wheelchair, and had significant decreased swelling of the right lower extremity but still has moderate swelling of the foot and toes. AR594. Dr. DeHaan prescribed Lyrica and Nucynta (an opioid) for pain, nortriptyline to help with sleep, and switched her Celexa to fluoxetine to try to better control her depression. AR595. Medicaid denied coverage for the Nucynta, so hydrocodone was prescribed. AR593. Dr. DeHaan also referred her for physical therapy. AR592.

Ms. Ruff saw Dr. DeHaan on November 5, 2012, and continued to report symptoms of racing thoughts, feelings of losing control, difficulty concentrating, depressed mood fatigue and feelings of worthlessness/guilt gradually getting worse since her accident. AR590. She was walking slowly with a walker and her neurological examination was "negative." Her general appearance was also alert and in no distress. AR591. Her depression

6

medication, Prozac, was increased.  AR591. On November 9, 2012, Dr. DeHaan

extended Ms. Ruff's handicapped parking permit for 3 months.  AR590.

Ms. Ruff was seen in the neurology clinic on December 5, 2012, and

reported no additional seizure activity, but she said she had been diagnosed

with RSD[3] in her ankle.  AR588-89.  On examination, Ms. Ruff was alert and

oriented, her cranial nerves were intact, she had 5/5 strength in her upper

extremities and 5/5 lower extremity strength on the left, her right hip flexion

and knee extension were 5/t, and the rest of the exam was not done due to her

brace.  AR588.  Her gait was antalgic.  AR588.  Her seizure medication, which

she was tolerating well, was continued.  AR588-89.

Ms. Ruff was seen at the neurology clinic on June 24, 2013, and reported

no new seizures, but worsening depression because her 11-year old needed

therapy after witnessing her seizures and she had to move out of her

apartment and was looking for a job.  AR582. On examination she was alert

and oriented, her gait was normal, and she had no focal weakness.  AR582.

Her seizure medication was changed to Lamictal, a mood stabilizer, due to

possible side effects of depression.  AR582-83.

---

[3] RSD is an older term used to describe Complex Regional Pain Syndrome (CRPS).
RSD and CRPS are chronic conditions characterized by severe burning pain, most
often affecting one of the extremities (arms, legs, hands, or feet).  There are often
pathological changes in bone and skin, excessive sweating, tissue swelling and
extreme sensitivity to touch, known as allodynia.  RSD is sometimes called Type 1
CRPS, which is triggered by tissue injury where there is no underlying nerve
injury, while Type II CRPS refers to cases where a high-velocity impact occurred at
the site and is clearly associated with nerve injury.  RSD is unusual in that it
affects the nerves, skin, muscles, blood vessels and bones at the same time.  See
https://health.ny.gov/diseases/chronic/reflex_sympathetic/.  All internet sources
in this opinion last checked Jan. 18, 2019.

When she was seen by Dr. DeHaan the next day he also changed her depression medication back to Celexa from Prozac to try to better control her symptoms. AR581. Dr. DeHaan also encouraged counseling. AR582. On examination, Ms. Ruff's speech, affect, mood, dress, and thought content were normal. AR581.

Ms. Ruff saw Dr. DeHaan on July 9, 2013, for a pre-surgery consultation prior to another surgery by Dr. Alvine on Ms. Ruff's foot due to ongoing pain. AR578. Under the review of systems psychiatric it states her anxiety and depression were "stable now." AR580. On examination her gait, station, reflexes, and strength in all muscle groups were normal. AR580. Her thought content was appropriate. AR580.

On August 14, 2013, Ms. Ruff contacted Dr. DeHaan to get approval and a refill for an increased dosage of Celexa due to increased [stressors], and her dosage was increased. AR578. On September 11, 2013, Ms. Ruff contacted Dr. DeHaan by phone because she had been unable to come to Sioux Falls for an appointment and again requested that her Celexa dosage be increased due to stressors including her son, surgery, and moving, and her counselor had recommended she discuss increasing her dosage with Dr. DeHaan. AR576. Dr. DeHaan stated she was already at the maximum dose of Celexa. AR576.

Ms. Ruff was seen at the neurology clinic on October 24, 2013, and reported no new seizure activity, and improved depression being on Lamictal and Celexa. AR573. On May 13, 2014, Ms. Ruff contacted the neurology clinic and reported having almost daily episodes for the past two to three months

where she forgets what she is doing and episodes where she will start to say something and a completely different word comes out than what she intended to say. AR569-70.

Ms. Ruff contacted Dr. DeHaan on June 16, 2014, with increased symptoms and requested an increased dosage of Klonopin, but Dr. DeHaan refused because she was already on a high dose, and indicated she needed to continue with her counseling, and if she feels she needs more she will need to see a psychiatrist for recommendations. AR569. Ms. Ruff stated that she was working one day per week for 4 hours but was wondering if she needed to stop because her ankle pain was worsening. AR569. Ms. Ruff mentioned applying for disability and she was told if she needed help the clinic had a therapist who could assist her. AR569.

Ms. Ruff contacted the neurologist's office on July 2, 2014, and was scheduled for an EEG later in the month, but had woke up on the bathroom floor, unaware of what happened and she believed she had a seizure and bit her lip. AR568. She said she had 3 beers that evening over about a 3-hour period. AR568. Her lamotrigine dosage was increased. AR568.

Ms. Ruff saw Dr. DeHaan on July 8, 2014, and reported that her depression and anxiety symptoms were fairly well controlled, but was having increased stress at home, chronic ankle pain, and weight gain. AR567. On examination her mood, affect, speech, dress and thought content were normal. AR567. Dr. DeHaan continued her medications, stressed the importance of

counseling, and renewed her handicapped parking permit for another year. AR567.

Ms. Ruff contacted the neurology clinic on March 2, 2015, to cancel an appointment because she had fallen and twisted her foot. AR812.

Ms. Ruff saw Dr. DeHaan on June 2, 2015, and reported that her depression and anxiety symptoms had been worse the past six months and she had chronic pain in her right ankle. AR 928, 930. Her grooming was noted as good, but her insight poor. AR930. Her medications were continued unchanged. AR930.

Ms. Ruff was seen at the neurology clinic on June 5, 2015, for her seizures and had just completed a video EEG, which showed no abnormal activity. AR909. Her seizure medication was changed to Topamax due to weight gain from lamotrigine. AR909. On examination, Ms. Ruff's gait was normal, her speech and language were intact, and she had 5/5 strength in both her upper and lower extremities. AR912.

Ms. Russ was seen at the neurology clinic on November 5, 2015, and reported no new seizure activity, but the neurologist felt she was having some word-finding trouble during conversations in the exam, and also appeared a little tired. AR914. Ms. Ruff was taking gabapentin and asked to have the dosage increased due to ankle pain, but the neurologist asked her to see her primary care physician and orthopedic physician for options because gabapentin was not helping with the pain and was making her drowsy and loopy. AR914, 917. On examination, Ms. Ruff was alert, well appearing, but

seemed tired and oriented and her speech was intact, although she struggled at times with words. AR916. Her gait was normal and she had 5/5 strength in her upper and lower extremities. AR916.

Ms. Ruff saw Dr. DeHaan on November 5, 2015, and complained of weight gain, chronic ankle pain, which was not being helped by gabapentin, which also made her feel "out of it." AR932. She continued to take clonazepam several times daily for anxiety. AR932. She said that Lexapro seemed to be "doing well for her depression and anxiety overall." AR932. Ms. Ruff reported that her sleep was okay, but was limited by her inability to walk, and had filed for disability. AR932. On examination she was alert and in no severe distress, but she was tearful as she talked about some of her issues at home, and she exhibited no noticeable tremors. AR932. Dr. DeHaan's assessment was chronic right foot pain, status post triple arthrodesis, and he noted that her chronic pain was a long-term issue that will probably never be totally resolved. AR933. Dr. DeHaan encouraged Ms. Ruff to continue with her exercise program, which he thought would be beneficial as long as she didn't over do that. AR933. Dr. DeHaan also noted that Ms. Ruff's Lexapro looked like it was "working fine," and recommended continued counseling, and noted that her seizure disorder was "currently controlled on Topamax." AR933.

Ms. Ruff saw Dr. DeHaan on April 21, 2016, and reported issues with increased anxiety, and wondered if ADHD could be causing her difficulties with focus and motivation. AR934. Dr. DeHaan noted that she had started counseling, and that her focus and motivation problems could be secondary to

11

her depression. AR934. Dr. DeHaan's assessments included chronic depression with anxiety, adjustment disorder with depressed mood, and poor concentration with family history of ADHD. AR934. Her Lexapro medication was changed back to citalopram for her depression. AR934. Dr. DeHaan observed that Ms. Ruff was alert and in some distress, her mood and affect were normal and her neurological examination was grossly intact with no evidence of tremor, her gait was "her normal ataxic gait for her," and she had chronic ankle pain. AR934.

Ms. Ruff was seen on August 3, 2016, at the Neurology Clinic for her epilepsy/seizures. AR856. She reported no new seizure activity and her seizure medication was continued. AR856. On examination her memory, language, attention, and concentration were normal and she exhibited normal higher cognitive functions. AR856. Further, her gait, finger to nose, and heel to shin examinations were normal and she had 5/5 strength in both the upper and lower extremities. AR856. She was seen again on February 1, 2017, with no changes in symptoms or medications. AR926. Her examination findings were unchanged. AR926.

Ms. Ruff saw Dr. DeHaan on December 1, 2016, for a physical and had concerns regarding neck pain and her anxiety, and also reported constant fatigue. AR936. Her concerns regarding neck pain were not addressed in the exam notes. AR936.

On March 20, 2017, Dr. DeHaan completed a medical source statement regarding Ms. Ruff's ability to sustain full-time work. AR849-51. Dr. DeHaan

stated Ms. Ruff could only lift 10 pounds occasionally or frequently, was limited to standing or walking less than two hours of an 8-hour workday, could sit about six hours in an 8-hours workday, and should never climb ramps/stairs or ladders/scaffolds, never balance, and only occasionally stoop, kneel, or crouch.  AR850.  Dr. DeHaan also stated Mr. Ruff was limited to frequent reaching, handling, fingering, and feeling.  AR850.

### 2.    Core Orthopedics Clinic (including related hospital records):

Ms. Ruff saw Dr. Alvine of Core Orthopedics both at his clinic and initially when hospitalized on July 23, 2012, following her automobile accident and ankle injury.  AR505.  His initial impression on July 23, 2012, was a complete dislocated/extruded talus, now reduced with a span and external fixator, open.  AR405.

On July 25, 2012, Dr. Alvine performed surgery on Ms. Ruff's ankle, irrigating and debriding it, removing the fixator, pinning it, and closing the wounds.  AR402.

Ms. Ruff saw Mary Fiedler, a certified nurse practitioner, for follow-up on August 9, 2012, but her ankle was too swollen to remove sutures, so she received a splint and was told to elevate the ankle.  AR401.  Ms. Ruff reported that her daughter was getting married in a few days and she "has been up and not keeping this elevated as much as she probably should."  AR401.  Dr. Alvine saw Ms. Ruff again on August 13, 2012, and Ms. Ruff reported that she had a small posterolateral talus fracture of her left ankle and was in a CAM boot, in addition to the injury to her right ankle, with continued pain with numbness

on top of the right foot. AR400. Ms. Ruff reported that she was "doing well" and had no complaints or concerns. AR400. On August 28, 2012, when seen again, one of the pins in the right ankle which had backed out was removed and she was placed in a CAM boot. AR399. Dr. Alvine noted that Ms. Ruff's foot alignment looked good, she had no swelling of the leg or pain to palpitation in the calf, and her gentle range of motion of the ankle was without pain. AR399. Dr. Alvine also prescribed Neurontin because she was hypersensitive to light touch throughout the foot and he suspected the nerves were waking up. AR399. By September 6, 2012, Ms. Ruff continued to report pain issues and she was taken out of the CAM boot and into a cast, and pin removal was scheduled. AR398. On examination, her wounds were healed up, she exhibited mild swelling, her right foot alignment looked good, and she had full range of motion of her left ankle. AR398.

On September 12, 2012, Dr. Alvine surgically removed the pins in Ms. Ruff's right ankle. AR395, 534-35 (surgical procedure report), 548 (discharge report).

Ms. Ruff saw Dr. Alvine on October 1, 2012, and reported struggling with burning pain in the top of her right foot and she said she could not dorsiflex her ankle. AR393. Examination showed no significant swelling, but she was hypersensitive to light touch throughout the foot. X-rays of the ankle showed good alignment of the foot, but again showed the defect of the talar head. AR393. Dr. Alvine concluded that Ms. Ruff was developing a complex regional pain syndrome or RSD, and he prescribed aggressive physical therapy to

14

improve range of motion, strength, and flexibility and Lyrica for nerve pain. AR393, 428.

Ms. Ruff saw Dr. Alvine on November 5, 2012, and reported she had continued pain and was unable to put weight on her right foot. AR391. X-rays showed diffuse osteopenia of the ankle and examination revealed the foot was cool and clammy, some generalized swelling, stiff range of motion, and she was still hypersensitive to light touch throughout the foot. AR391. Dr. Alvine stated it appeared to be a form of RSD and he prescribed sympathetic blocks, contrast baths, and physical therapy. AR391, 429, 527 (right lumbar sympathetic block procedure).

Ms. Ruff saw Dr. Alvine on December 6, 2012, and reported she was doing better but still struggling. AR387. The sympathetic block had not helped and her Lyrica dosage had recently been increased. AR387. She was able to walk without a CAM boot in the office and exhibited less hypersensitivity and less point tenderness of the foot. AR387. Dr. Alvine recommended physical therapy and supportive shoes. AR387. He stated that she may need a subtalar joint and TN fusion in the future. AR387.

Ms. Ruff saw Dr. Alvine on January 17, 2013, and she was making slow steady progress, but still had antalgic gait and walked fairly stiffly flatfoot, dragging her foot basically, but was weight bearing. AR384. She said she was basically out of the boot most of the time and off her walker. AR384. Examination revealed continued hypersensitivity to light touch and her foot was somewhat warm. Dr. Alvine felt she had RSD or regional complex pain

15

syndrome and noted she was taking hydrocodone, which he cautioned her to take sparingly, as well as Lyrica, physical therapy and contrast baths.  AR384. Dr. Alvine stated Ms. Ruff should continue to be off work.  AR385.

Ms. Ruff saw Dr. Alvine on February 28, 2013, and had made great progress; was walking without a walker or cane, and had much less hypersensitivity to light touch.  AR423.  Dr. Alvine stated Ms. Ruff was going to try to go back to work.  AR423.

Ms. Ruff was discharged from physical therapy on March 14, 2013, following 32 treatment visits (AR434-42), and the physical therapy discharge note on April 10, 2013, indicated that she continued to have ankle pain (rated 4/10), worse when on her feet, and her ankle impacted her ability to walk, recreate, bend, work duties, and standing.  AR433.  Her problems continued to include her gait, balance, strength, and pain and her rehabilitation potential was noted as only fair.  AR433, 446.  Ms. Ruff was discharged from physical therapy because she did not show up to appointments and failed to reschedule. AR433.

Ms. Ruff saw Dr. Alvine on May 13, 2013, and reported hindfoot pain and swelling with activity.  AR422.  She had returned to work, but said she could not work a full shift.  AR422.  Examination showed reduced range of motion of the right ankle, and decreased sensation to light touch in the dorsum of the great toe and in the webspace.  AR422.  Otherwise, her sensation was normal.  AR422.  Dr. Alvine noted that "her foot finally looks good."  AR422. Dr. Alvine stated that he thought she would eventually need the ankle fusion,

and the subtalar joint was injected.  AR422.  She was to continue working only four-hour shifts.  AR422.  Dr. Alvine also examined her left ankle which had also been fractured and reviewed her CT scans and noted that she had a snowboarder type fracture, so they needed to keep a watch for any left-sided pain.  AR422.

Ms. Ruff saw Dr. Alvine on June 25, 2013, and was doing reasonably well although she said she was having hindfoot pain with much activity at all.  AR417.  Based on the damage to the talar head, dislocated hindfoot, and degenerative changes, Dr. Alvine recommended a subtalar joint and talonavicular joint fusion.  AR417.  An MRI was obtained and revealed marked signal abnormality of the talus suggesting underlying AVN with accelerated degenerative changes.  AR419.  The fusion surgery and a bone graft was performed by Dr. Alvine on July 16, 2013.  AR413, 513-15 (surgical report).

Ms. Ruff saw Dr. Alvine on August 29, 2013, and reported that she was "doing well" and everything just ached.  AR411.  On examination, her right foot range of motion was without pain.  AR411.  X-rays showed that unfortunately she was developing more and more joint space narrowing of the ankle joint.  AR411. She was placed in a CAM boot and told to begin one-half weight bearing for two weeks then full weight bearing.  AR411, 469 and 475 (physical therapy).  Ms. Ruff was seen on October 3, 2013, and reported she was "doing well" with no new complaints or concerns.  AR410.  X-rays showed internal healing, acceptable alignment, and no hardware failure or loosening.  AR410.  Therapy was prescribed to begin strengthening and weaning into a supportive

17

shoe. AR410. On November 21, 2013, when seen Ms. Ruff reported she was
doing well and making good progress in physical therapy. AR409. She also
said she had a little ankle soreness and X-rays showed joint space narrowing of
the ankle developing consistent with posttraumatic arthritis. AR409. A
cortisone injection was given. AR409.

Ms. Ruff saw Dr. Alvine on May 21, 2014, for her ankle. AR834.
Dr. Alvine described her as doing well from her double arthrodesis, but having
some pain, and examination revealed a rigid hindfoot, swelling and stiffness,
and pain on flexing. AR834. X-rays revealed that the ankle joint had narrowed
to about 1mm compared to two years earlier, and there was sclerosis
consistent with some AVN of the dome of the talus. AR834. AVN is avascular
necrosis and is a condition that occurs when there is blood loss to bone, which
cause the bone to die, and eventually collapse. See
https://www.webmd.com/arthritis/avascular-necrosis-osteonecrosis-
symptoms-treatments#1. Dr. Alvine stated that eventually she may need her
ankle fused or replaced, but he wanted to hold off as long as possible, and a
cortisone and Marcaine injection was given. AR834. Following the injection
Ms. Ruff reported the pain had improved, which Dr. Alvine stated confirms the
ankle is the problem, and he provided her a note allowing her to return to only
sedentary work to help with her ankle problems. AR834; see AR835 (note
restricting her to sedentary work only).

Ms. Ruff saw Dr. Alvine on July 10, 2014, and reported continued pain
without relief from the cortisone shot. AR832. On examination, she dorsiflexes

to neutral and plantarflexes maybe 20 degrees, subtalar motion was rigid, her foot alignment looked good and she had only mild swelling. AR832. Dr. Alvine stated it would be nice to replace the joint, but he was not sure her bone quality was sufficient due to the talar AVN. AR832. A CT of the right ankle revealed severe tibiotalar degenerative joint disease with bone-on-bone and tilt of the talus, which "certainly could be a source for significant pain" and an intra-articular nondisplaced sagittally oriented stress fracture of the talar dome. AR833. After reviewing the CT, Dr. Alvine stated he felt an ankle replacement would be "fraught with some potential complications, i.e., setting a component on dead bone" and the other option is pantalar fusion, which is not great either. AR831.

Ms. Ruff saw Dr. Alvine on July 24, 2014, and x-rays revealed severe degenerative changes of the ankle joint with osteopenia centrally in the talus consistent with AVN. AR830. Dr. Alvine recommended a pantalar fusion because an ankle replacement would be set on unhealthy bone. AR830. Ms. Ruff wanted to avoid the pantalar fusion, and Dr. Alvine stated that he did not blame her because patients with pantalar fusions do struggle. AR830. He stated that "either way she probably needs to do something since her ankle is so painful when she tries to walk." AR830.

Dr. Alvine performed surgery on Ms. Ruff's ankle on September 10, 2014, and removed the hardware of the subtalar joint and talonavicular joint, replaced the ankle joint and a gastroc slide procedure. AR484, 486-88. Dr. Alvine noted in his surgical report that when he removed the talar dome,

19

Ms. Ruff's bone was "very friable and a chalky and crumbled, but they [sic] appeared to be good healthy bone at the base." AR487.

Ms. Ruff saw Dr. Alvine on September 29, 2014, and she was two weeks post ankle replacement. AR827. She said she was doing well with no complaints or concerns. AR827. Her incision was healing, range of motion was without pain, and she was placed in a short-leg non-weight bearing cast. AR827. On October 27, 2014, Ms. Ruff reported that she was doing "quite well" and was progressed to a CAM boot with one-half weight for two weeks then full weight. AR826.

Ms. Ruff saw Dr. Alvine on January 5, 2015, four months after her ankle replacement surgery, and reported that she continued to have pain, mainly from swelling, and was unable to wear her regular shoes. AR823. She was wearing kind of a high heeled boot. AR823. Examination revealed generalized swelling, reasonably good range of motion, and hypersensitivity to light touch throughout the foot. AR823. Neurontin was prescribed for her pain. AR823. Dr. Alvine continued to restrict her to sedentary work. AR824.

Ms. Ruff saw Dr. Alvine on April 6, 2015, six months post-surgery and she continued to struggle with swelling and pain with activity without relief from Neurontin. AR822. X-rays of her ankle showed well positioned components, but did show "some mild osteopenia underneath the lateral portion of the talar component, but by and large things look really good." AR822. Therapy was recommended to work on edema control, range of motion, strengthening, and proprioception. AR822.

Ms. Ruff saw Dr. Alvine on June 29, 2015, nine months post-surgery, and she continued to report that she struggled with pain, her ankle feeling like it wants to give out on her, and not being able to walk as far as she would like. AR821. She said she wore supportive shoes most of the time, but was wearing flip flops at the appointment. AR821. Dr. Alvine prescribed an ankle gauntlet, and neuropathic pain cream. AR821. Dr. Alvine continued to restrict her to sedentary work, stating, "I do not think she is in a position to work on her feet...." AR821.

Ms. Ruff saw Dr. Alvine on September 10, 2015, and continued to report pain, which seemed to bother her more and more, and she continued to be hypersensitive to light touch along the superficial peroneal nerve and the tibial nerve. AR874. She exhibited no significant swelling and her ankle appeared stable with good range of motion. AR874. Dr. Alvine felt it was nerve pain, worse as swelling increased throughout the day. AR874. On September 10, 2015, Dr. Alvine wrote to Dr. DeHaan regarding Ms. Ruff's condition and said she was doing reasonably well, but not as well as he had hoped. AR875. Dr. Alvine noted that Ms. Ruff was up and walking and active. AR875. Dr. Alvine said Ms. Ruff was having more burning pain when she was on her foot all day long that he suspected was nerve pain and he wanted to increase her Neurontin dosage, but had not due to questions about complications with her seizure condition. AR875.

Ms. Ruff saw Dr. Alvine on April 11, 2016, with reports of ongoing pain and swelling in her ankle. AR873. She said she was "doing okay." AR873.

She reported using a treadmill for exercise but it bothered her and she had not returned to work. AR873. Examination revealed mild generalized swelling, tenderness to light touch. AR873. Ms. Ruff also had good strength in all four planes and Dr. Alvine noted that "when she stands she has a well-balanced foot and ankle." AR873. X-rays did not reveal any evidence of RSD, and Dr. Alvine felt it was just a chronic pain issue. AR873. He noted that Ms. Ruff was trying to get active and looked "better today actually clinically than she has in a long time." AR873. Dr. Alvine recommended "no impact" type of exercise rather than a treadmill and felt it was a reasonable next step to try to get back to a sedentary job. AR873.

Ms. Ruff saw Dr. Alvine on August 22, 2016, and reported that her ankle continued to hurt, but she was struggling more with her left shoulder. AR870. Ms. Ruff reported that she falls due to her ankle and injured the left shoulder resulting in pain and numbness going down the arm to the hand. AR870. Examination revealed full cervical motion, but she moved slowly and had a positive Spurling maneuver on the left, positive impingement reinforcement sign, tenderness over the scapula, a positive Hoffman sign, and range of motion caused pain. AR870. Ms. Ruff also had 5/5 strength in the upper and lower extremities with encouragement and her sensation was intact to light touch throughout her legs. AR870. Her right ankle examination revealed stiffness, but no swelling or point tenderness and her foot alignment was good. AR870. A cervical spine MRI was obtained that revealed a small disc bulge at C6-C7 with no nerve or cord compression, and a shoulder MRI revealed some mild

supraspinatus tendinosis and fluid in the subacromial space, and possible

bursitis. AR869, 858 (cervical spine MRI), 860 (left shoulder MRI). Dr. Alvine

referred her to one of the clinic's shoulder specialists, Dr. Peterson. AR869,

872.

Ms. Ruff saw Dr. Peterson on October 7, 2016, for her left arm/shoulder

and reported it was giving out and she had pain down to her fingers radiating

into her hand. AR867, 881. Examination revealed some mildly pronounced

impingement signs, mild to moderate pain over her AC joint, and she was very

guarded with her pain. AR867. In addition, her left shoulder examination

showed full motion in all planes and her neurovascular examination was intact

with no evidence of instability with range of motion and mobility. AR867.

Dr. Peterson reviewed the left shoulder MRI and stated it revealed severe

subacrominal bursitis, AC arthritis, and possibly SLAP tear, but no rotator cuff

tear. AR867. Dr. Peterson's impression was possible evolving frozen shoulder

and a diagnostic lidocaine injection was given to try to determine where her

pain was coming from. AR867. Ms. Ruff reported that after the injection she

was pain free for a few hours so a repeat corticosteroid injection was

administered on November 2, 2016. AR864, 866, 878.

### 3. Dakota Counseling Institute:

Ms. Ruff was seen on September 10, 2013, at Dakota Counseling for an

individual psychotherapy intake exam. AR477. She reported problems with

anxiety including worrying, inability to stay focused, talking too much, racing

thoughts, and restlessness and depression symptoms including feeling sad or

blue, loss of interest in activities, guilt, low energy, and low self-esteem. AR477. Ms. Ruff reported prior counseling after her automobile accident in 2012, and she was already taking anti-depressants which she did not feel were working. AR477. Ms. Ruff's mental status included affect was often anxious and at times, tearful, her MMSE score was 27 of 30, indicating no gross cognitive impairment, but was difficult to determine due to some tangential answers, and she acknowledged some passive suicidal ideation without a plan or intent. AR479. In addition, Ms. Ruff demonstrated appropriate social interactions, she spoke fluently with no pauses and appropriate tone, her memory appeared intact, her ideational processes were goal oriented, and there were no apparent signs or reports of delusions or hallucinations. AR479. Ms. Ruff's diagnoses included major depressive disorder, recurrent, mild, with full inter-episode recovery, and generalized anxiety; her GAF was assessed at 53. AR479. Under the SED/SPMI Determination it stated there was no evidence to support classification of a serious mental illness at this time. AR479.

Ms. Ruff saw Donna Aldridge, MA, QMHP, a mental health clinician, for counseling on January 8, 2016. AR836. Ms. Ruff reported feeling good that day, however, she was concerned about long-term "range of motion and pain." AR836. Ms. Aldridge observed that Ms. Ruff was alert and oriented, she appeared to have quite a bit of energy, and her affect was congruent with the topics discussed. AR836. The session focused on looking at different treatment goals in order to develop a treatment plan. AR836.

When Ms. Ruff saw Ms. Aldridge for counseling on March 16, 2016, Ms. Aldridge noted that Ms. Ruff was looking somewhat better than at her last appointment; she had showered and was dressed in comfortable business attire. AR837. Ms. Ruff reported she had been extremely depressed and she was tearful throughout the session. AR837. The plan for the session was to see what, if anything, differently Ms. Ruff had been doing to help deal with her "debilitating depression." AR837. Suggestions had been discussed at her last session, but Ms. Ruff had cancelled an appointment once again because "it is likely ... she just did not want to get up and get dressed." AR837. Ms. Aldridge stated that they discussed some ways to combat the debilitating affects of depression, and had discussed these before, "but [Ms. Ruff] does not seem to remember much of those conversations. It appears she is frequently distracted with other anxieties and worries and repetition is necessary." AR837.

Ms. Ruff was seen for counseling with Ms. Aldridge on May 4, 2016, and Ms. Ruff appeared tired, and showed signs of anxiety as well. AR839. She was alert and oriented and her grooming and dress were appropriate for the weather and situation. AR839. Ms. Ruff reported feeling depressed and frustrated, and apologized for missing the prior session, which she had promised to keep. AR839.

On June 2, 2016, Ms. Aldridge noted that Ms. Ruff appeared more energized. AR841. She said that she was using the gym more. AR841. On August 30, 2016, Ms. Aldridge noted that Ms. Ruff's mood was slightly better and Ms. Ruff reported that she had not attended gym three times the first week

following her last appointment, but had attended the gym three times in the second week following her last appointment.  AR847.  Ms. Ruff was very happy and proud to report this, although she wasn't sure she would be able to keep it up, and indicated that it was a lot of work to get up, get dressed, go the gym, and then shower again and get home.  AR847.

The Appeal Record contains additional counseling records approximately every two weeks through September 13, 2016.  AR837-48.  On August 2, 2016, Ms. Ruff's mood was depressed and evidenced by her psychomotor retardation, body posture and her statements.  AR845.  She was alert and oriented and her grooming and dress were appropriate. AR845.  On August 16, 2016, Ms. Ruff's mood seemed slightly less depressed, but there was still some evidence of psychomotor retardation, flat affect and some helpless/hopeless ideation. AR846.  Ms. Ruff said that she had been getting out and going to the gym, but she found that to be nearly impossible.  AR846.  On September 13, 2016, (the last counseling record in the Appeal Record), Ms. Ruff continued to complain of depression, not wanting to get out of bed, and frequently not taking care of her personal hygiene. AR848.

On March 22, 2017, Ms. Aldridge provided a letter regarding Ms. Ruff's treatment at Dakota Counseling Institute.  AR822.  Ms. Aldridge stated Ms. Ruff had been a patient since 2013 when she briefly attended outpatient therapy.  AR882.  The Appeal Record contains Ms. Ruff's intake appointment in 2013, but does not contain any outpatient treatment records from that time. See AR477-81.  Ms. Aldridge stated that Ms. Ruff returned for therapy in

January, 2016, and had attended therapy generally every two weeks since that time. AR882. The Appeal Record contains therapy notes from January 8, 2016, through September 13, 2016, but no other treatment notes. <u>See</u> AR836-48. Ms. Aldridge stated that when Ms. Ruff returned for treatment in 2016 she was assessed with PTSD in addition to depression and anxiety, and all three diagnoses caused Ms. Ruff clinically significant degrees of difficulty with activities of daily living in all environments. AR882. Ms. Aldridge noted that Ms. Ruff had progressed in therapy at times, but due to stress had been unable to remember and apply what she learned. AR882. Ms. Aldridge explained that individuals with PTSD reach stimulus overload at a lower threshold than others and for Ms. Ruff this was a trigger for severe depression and she becomes paralyzed in terms of behavior and effectiveness. AR882.

Ms. Aldridge stated that despite efforts by Ms. Ruff, she was severely symptomatic the majority of the time. AR882. Ms. Aldridge stated that Ms. Ruff was relatively functional when seen in 2013, but had presented with marked deterioration in her daily functioning when she returned in 2016. AR882. Ms. Aldridge stated Ms. Ruff had days where she was unable to move from her couch due to depression, she lacked energy, she showed marked psychomotor retardation unless she was anxious, and she had trouble with initiation and action because she is easily overwhelmed. AR882. Ms. Aldridge stated Ms. Ruff also had impaired memory which is common in individuals with anxiety and depression, and she tries to concentrate, but intrusive thoughts continue to make concentration and attention difficult. AR882.

Ms. Aldridge stated, "I believe with a strong degree of psychological certainty that Sherry Ruff is currently unable to work, and that she has been unable to work at least since January 2016." AR883. Ms. Aldridge stated she was open to inquiry if additional information was needed. AR883.

Ms. Aldridge completed a mental limitations form on March 22, 2017, in which she indicated her opinions of Ms. Ruff's limitations if Ms. Ruff were to attempt to perform sustained full-time work on a regular and continuing basis. AR884. Ms. Aldridge indicated if Ms. Ruff attempted full-time work she would have marked limitations in remembering locations and work-like procedures, understanding and remembering detailed instructions, and carrying out detailed instructions, maintaining attention and concentration for extended periods, performing activities within a schedule, maintaining regular attendance, being punctual, working in coordination with or proximity to others without being distracted by them, making simple work-related decisions, completing a normal workday and workweek without interruptions from psychologically-based symptoms, performing at a consistent pace without unreasonable breaks, accepting instructions and responding appropriately to criticism from supervisors, getting along with co-workers, responding appropriately to changes in work setting, traveling to unfamiliar places, and setting realistic goals or making plans independently of others. AR885-86.

Ms. Aldridge also indicated if Ms. Ruff attempted full-time work she would have moderate limitations in her ability to understand, remember and carry out very short and simple instructions, sustain an ordinary routine

without special supervision, interact appropriately with the public, ask simple questions or request assistance, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, and be aware of normal hazards. AR885-86. The degree of limitation terms were defined for Ms. Aldridge in the form with "marked" meaning a substantial loss of ability to function on a sustained full-time basis, and "moderate" as an impairment that more than slightly interferes with the work ability on a full-time basis. AR884.

On August 8, 2017, Ms. Aldridge provided another letter regarding Ms. Ruff's treatment at Dakota Counseling Institute. AR72-73. Ms. Aldridge described some of the factors leading to Ms. Ruff's PTSD symptoms including living with a mentally ill mother, being placed in out-of-home care when her mother was hospitalized or charged with crimes because her father refused to take her, and being in several abusive relationships and two abusive marriages. AR72. Ms. Aldridge stated that Ms. Ruff experiences ongoing symptoms of PTSD including recurrent, involuntary and intrusive distressing memories and dreams, intense psychological distress at exposure to internal and external cues she interprets as abuse, persistent avoidance of stimuli associated with the traumatic event, dissociative reactions, and increasing depression. AR72.

### 4. State Agency Assessments.

The State agency physician consultant at the initial level on May 14, 2015, found that Ms. Ruff had severe physical limitations of reconstructive surgery of a weight bearing joint and epilepsy, which limited her to lifting 20

pounds occasionally, 10 pounds frequently, standing or walking four hours of an 8-hour workday, sitting about six hours of an 8-hour workday, and she may need a cane for long distances. AR123, 125. The consultant also limited Ms. Ruff to frequent postural activities (and occasional climbing of ladders, ropes, and scaffolds) and to avoid even moderate exposure to hazards. AR126-27. The consultant noted an opinion on January 5, 2015, from Dr. Alvine, Ms. Ruff's treating orthopedic surgeon, that restricted Ms. Ruff to work in a sedentary position, and stated it was "non specific, but reasonable." AR125.

The State agency physician consultant at the reconsideration level on August 24, 2015, found that Ms. Ruff had severe physical impairments of reconstructive surgery of a weight bearing joint and major motor seizures, which limited exactly the same as determined by the consultant at the initial level. AR150, 152-54. The consultant also noted the same January 5, 2015, opinion from Dr. Alvine, Ms. Ruff's treating orthopedic surgeon, that restricted Ms. Ruff to work in a sedentary position, and again stated it was "non specific, but reasonable." AR152.

**D.      Testimony at ALJ Hearing**

      **1.      Ms. Ruff's Testimony:**

Ms. Ruff testified that in 2012 she was in an automobile accident caused by a seizure and both of her ankles were broken, but her right ankle was shattered, and eventually her right ankle was replaced in 2015 by Dr. Alvine. AR94-96.

Ms. Ruff testified that her ankle was still painful and she could only walk 30-35 minutes. AR95. Ms. Ruff testified that when she sits her right foot swells then freezes up and then makes it difficult to walk when she gets up. AR93. Ms. Ruff testified to address the swelling she would elevate the foot, put ice on it and take gabapentin, but she didn't like taking gabapentin during the day because it would put her "like to sleep." AR94. Ms. Ruff testified that she felt Dr. DeHaan limited her to lifting only 10 pounds because she had poor balance due to her ankle and was unsteady on her feet. AR102.

Ms. Ruff testified that due to poor balance caused by her ankle she stumbles and bumps into walls or something at times and one time stumbled enough so that she hurt her shoulder. AR96.

Ms. Ruff testified that she has seizures and believed her last one was in July, 2015, when she was home alone and woke up in the bathroom, felt groggy, and had soiled herself. AR96. She testified that she did not go to the emergency room for this seizure "because the seizures that I have had have never shown up because the activity has already been done." AR96.

Ms. Ruff testified that Dr. DeHaan had been treating her for depression and anxiety for several years due to an abusive relationship, but it got worse after her automobile accident. AR96. She testified that both her significant other and her oldest son were abusive to her, and her older son was physically abusive to the point she had to call police. AR101.

Ms. Ruff testified that due to her depression she will not shower or change clothes for maybe a week, and the only thing she does is take her

youngest son to school and back. AR97. She said she had few friends and only one who could coax her out of her house once every other month, did not go to church because it was too crowded, no longer went to the gym and was not friends with her neighbors. AR100-01.

Ms. Ruff testified that Dr. DeHaan recommended counseling and she sees Donna Aldridge about every other week, but had cancelled some appointments, and felt more frequent appointments would be too hard for her. AR98.

Ms. Ruff testified that she had not been referred to a psychiatrist or psychologist, but Dr. DeHaan had mentioned it, but she felt so comfortable with Dr. DeHaan. AR99. She explained that she had tried a number of different anti-depressants prescribed by Dr. DeHaan, but there were some limitations due to the risk of seizures with some medications. AR99.

Ms. Ruff said she had side effects from her medications including shaky handwriting, sleepiness, slurred speech sometimes, feeling spaced out, and problems organizing her thoughts. AR100.

Ms. Ruff testified that she used to go to the store every couple of days and had reduced her shopping trips to one to two times per week and goes when the store is not busy due to anxiety from the people. AR97. She said she no longer cooked, she just bought microwavable meals and Fiber One bars. AR97. Ms. Ruff testified that her house was a pit and needed cleaning and had gotten to the point she didn't even have any clean dishes left. AR98. When

asked who did the cleaning around her house, she responded that "when it does get cleaned, I do." AR98.

Ms. Ruff testified that after her automobile accident she was off work and did try returning to work for half days, two to three hour shifts, for a couple of months, but she couldn't stand long enough and would have to go home after "like an hour." AR97.

Following the testimony by the VE, Ms. Ruff testified that she had vision problems from her medications and goes to an optometrist, and she was concerned there were no vision treatment records in the file. AR112. The ALJ responded that she didn't see anything in the record, and stated "...one thing I do tend to do, I do even if I think of an impairment – whether I think an impairment is severe or not severe, I tend to include limitations for MRFC." AR112. Then the ALJ just ended the hearing stating, "Well thank you for coming out today. ..." AR112-13.

## 2. Attorney Request for Mental CE:

Ms. Ruff's attorney stated to the ALJ that due to the limited mental health evidence in the record he was requesting a neuro-psych evaluation. AR102. The ALJ agreed that "there's not a lot of medical evidence concerning [Ms. Ruff's] mental health impairments or allegations" but responded that she was not going to order an exam "in light of the claimant having insurance and the opportunity to seek further treatment." AR103. The "insurance" referred to appears to be Medicaid. See AR427, 507, 525, 532, 564, 569, 574, 583, & 592.

Ms. Ruff then stated, "I guess I didn't know that I was supposed to go to somebody else. I just was going to my counselor like my doctor said." AR104. The ALJ answered, "Well I'm not certain how is that I want to address that [sic]. I guess honestly I wouldn't necessarily have expected you to know or necessarily dictate your treatment according to social security rules and regulations, and I wouldn't and can't encourage anyone necessarily to go against their doctor's advice." AR104.

### 3.   Vocational Expert Testimony:

The ALJ asked the vocational expert ("VE") if he needed any additional information about the claimant's past work and the VE asked about the data entry job, and indicated that he had only guessed about that job and asked what that job was. AR106-07. The ALJ had some further discussion about various past jobs, and without answering the VE's question stated, "I think I'm mistaken Mr. Audette. So then I'm going to find no past relevant work. You just heard that?" AR108. The VE responded "Okay." AR108.

The ALJ then asked a hypothetical question to the VE:

Q      Okay, I present my first hypothetical. Assuming the individual same age, education, work background as the claimant, can lift 20 pounds occasionally, 10 pounds frequently, sit up six hours in an eight hour workday, stand, walk up to four hours in an eight hour workday, push, pull, lift, carry, or need the option to use a single-point cane when ambulating distances greater than 100'.

A      Could you repeat that?

Q      Will need the option to use a single-point cane when ambulating distances greater than 100', occasional postural activities except never climb ladders, ropes or scaffolds. Avoid moderate exposure to hazards such as unprotected heights and

34

dangerous machinery, should not be required to drive as part of job duties, limited to simple routine repetitive task. Would there be jobs in the competitive economy that the hypothetical individual could perform?

AR108-09. The VE testified that the occupations of electronics worker, DOT #176.687-010, with upwards of 40,000 jobs nationally and 1200 jobs in the four-state region of Minnesota, Iowa, North Dakota and South Dakota, and small products assembler, DOT#706.684-022, with 15,000 to 20,000 jobs nationally and 600-700 jobs in the region were available but no other occupations. AR109-10. The VE explained that his testimony conflicted with the DOT because the electronics worker is Light, but he felt it was done primarily in a seated position and there would only be some standing and walking at times for short distances, and he had reduced the number of jobs for the small products assembler from 2,000 in the region to 600-700 because the 600-700 would offer the job with a sit/stand option where workers sit for 30 minutes then stand for 30 minutes and alternate throughout the day. AR109-10. He reduced the national numbers for the small products assembler job from 75,000 to 15- to 20,000. AR109. The VE explained that this portion of his testimony was based on his own experience working with clients and employers in the field of vocational rehabilitation. AR110.

The ALJ did not include any sit/stand option with any parameters in any hypothetical question to the VE or in the RFC. AR16, 108-112.

The VE was asked by Ms. Ruff's attorney if you had an individual who would have moderate difficulty in remembering locations, work-like procedures, and remembering very short and simple instructions, maintaining

35

concentration and attention, performing activities within a schedule, maintaining regular attendance, being punctual within customary tolerances, and with regard to interacting with the public and interacting with co-workers. AR111. The VE testified that this individual would probably be to the point they were not up to competitive employment standards; bottom line no jobs on a competitive level. AR111-12.

### 4. Other Evidence:

Ms. Ruff submitted a Function Report on March 8, 2015, as part of her disability application and reported that she only dressed, bathed or did her hair one to two times a week, because she was sore and had no energy. AR325. She stated that she no longer prepared full meals only quick microwave or crock-pot meals that she did in 15-20 minutes, because she had problems standing due to her ankle. AR326. She said that she drove and cared for her 13-year old son with Asperger's, taking him to and from school. AR325, 327. Ms. Ruff also said that she shopped in stores once a week for 45 minutes to one hour. AR327. She was able to pay bills, count change, handle a savings account, and use a checkbook/money orders. AR327. Ms. Ruff read and watched television every day, but stated it used to be less, and that she used to walk, bike, and go to the gym. AR328. She also visited her daughter once a month and spoke to her on the phone once a week. AR328. Ms. Ruff stated she did cleaning and laundry but the time needed varied and she had to take breaks while doing it. AR326. She stated she still used a walker on occasion, maybe one time per week, such as after a day when she would run

errands and then she would have more difficulty walking and balancing the next few days. AR330. Ms. Ruff stated she had problems with her memory, completing tasks, and concentrating, and could only pay attention a short amount of time due to racing thoughts and depression. AR329. She said that she followed written instructions okay. AR329. She also said she handled changes in routine okay. AR330. She had no problems getting along with others, including authority figures. AR329-30. Ms. Ruff stated her ankle is constantly swollen and warm to the touch by the end of the day. AR331.

**F.     Disputed Facts**

Ms. Ruff proposed the following facts, but the Commissioner disputed the bolded portions because the Commissioner asserted they were not expressly stated in the record so they were not concrete facts:

1.     The ALJ considered the opinions of the State agency psychological consultants and gave them "no weight" **so those assessments are not relevant to the ALJ's decision**. AR21.

2.     The State agency physician consultant at the initial level who noted an opinion on January 5, 2015, from Dr. Alvine, Ms. Ruff's treating orthopedic surgeon, that restricted Ms. Ruff to work in a sedentary position, and stated it was "non specific, but reasonable" **did not explain why the limitations he determined exceeded Dr. Alvine's restrictions, when he them found reasonable**. AR125-27.

3.     The State agency physician consultant at the reconsideration level who also noted the same January 5, 2015, opinion from Dr. Alvine, Ms. Ruff's

treating orthopedic surgeon, that restricted Ms. Ruff to work in a sedentary position, and again stated it was "non specific, but reasonable" **again did not explain why the limitations he determined exceeded Dr. Alvine's restriction, which he found reasonable. AR152-54. The consultant also did not mention Dr. Alvine's reiteration of his restriction to sedentary work on either June 29, 2015, or April 11, 2016. AR152-54,** *see* **AR821, 873.**

4.　　Ms. Ruff testified she was concerned there were no vision treatment records in the file and the ALJ responded that she didn't see anything in the record, and stated "…one thing I do tend to do, I do even if I think of an impairment – whether I think an impairment is severe or not severe, I tend to include limitations for MRFC," **but the ALJ did not ask the attorney to obtain the records or offer to get them, and instead** just ended the hearing stating, "Well thank you for coming out today…." AR112-13.

## G.　Decision of the ALJ[4]

### 1.　Step One

At Step One[5] of the evaluation, the ALJ found that Ms. Ruff had not engaged in substantial gainful activity, ("SGA"), since the date of her alleged

---

[4] A scaled-down version of the ALJ's opinion was stipulated to by the parties. See Docket No. 13 at pp. 1-5. The court has expanded on that stipulated version in order to provide a framework for subsequent analysis of the parties' arguments.

[5] The five-step sequential evaluation of a claim for disability benefits is described in some detail, *infra*, in Section B of the DISCUSSION section of this opinion.

onset of disability, July 22, 2012, and that she met the insured status for her SSDI claim through June 30, 2018.  AR14.

### 2.      Step Two

At Step Two, the ALJ found that Ms. Ruff had severe impairments of epilepsy, history of right ankle dislocation and fracture with subtalar fusion, major depressive disorder, and a generalized anxiety disorder.  AR14.  The ALJ also found that Ms. Ruff had medically determinable impairments of cervical disc disease, and tendinosis of her left shoulder, but determined they were not severe.  AR14.  The ALJ did not discuss any potential vision impairments.  Id.

### 3.      Step Three

At Step Three the ALJ found that Ms. Ruff did not have an impairment that met or medically equaled one of the listed impairments in 20 CFR 404, Subpart P, App 1 (20 CFR §§ 416.920(d), 416.925, and 416.926) (hereinafter referred to as the 'Listings').  AR14.  In evaluating whether Ms. Ruff met or medically equaled a Listing the ALJ discussed her mental impairments, but never mentioned her epilepsy or ankle impairment.  AR14-15.

Discussing Ms. Ruff's mental impairments, the ALJ evaluated the "paragraph B" criteria, which require one extreme or two marked limitations in these broad areas of functioning:  understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves.  AR14-15.  The ALJ defined "marked limitation" as the condition where one's functioning in this area independently, appropriately, effectively and on a sustained basis is seriously

39

limited.  AR15.  The ALJ defined an "extreme limitation" as an inability to function independently, appropriately, or effectively on a sustained basis.  Id.

The ALJ found Ms. Ruff had mild limitations understanding, remembering, or applying information.  Id.  This area of functioning is defined as the ability "to learn, recall and use information to perform work activities" including "understanding and learning terms, instructions, procedures; following one- or two-step oral instructions to carry out a task; describing work activity to someone else; asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; and using reason and judgment to make work-related decisions."  Id. (citing the Listings).  The ALJ supported its conclusion that Ms. Ruff was only mildly limited in this area by noting Ms. Ruff does okay with following written instructions and can follow oral instructions if she makes notes.  Id.  Also, Ms. Ruff can cook simple meals and do laundry, so the ALJ inferred she could understand and apply some information.  Id.  And while Ms. Ruff answered some questions at a consultative exam with tangential answers, she nevertheless demonstrated no impairment of gross cognition.  Id.

As to interacting with others, the ALJ explained this meant the ability "to relate to and work with supervisors, co-workers, and the public.  Examples include:  cooperating with others; asking for help when needed; handling conflicts with others; stating own point of view; initiating or sustaining conversation; understanding and responding to social cues (physical, verbal, emotion); responding to requests, suggestions, criticism, correction, and

challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness." Id. (citing the Listings). The ALJ supported its finding of mild limitations in this area because Ms. Ruff had represented in a March 8, 2015, function report that she had no difficulty getting along with others, including authority figures. Id. (citing Exh. 8E). In addition, the ALJ noted Ms. Ruff was able to constructively confront others to seek help for her son. Id. (citing Exh. 10F). The ALJ noted Ms. Ruff testified at the hearing that she claimed to avoid crowds because they made her anxious. Id.

The ALJ found Ms. Ruff had moderate limitations with concentration, persistence or maintaining pace. Id. The ALJ recited the regulatory definition of this area of functioning: the ability "to focus attention on work activities and stay on task at a sustained rate. Examples include: initiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day." Id. (citing the Listings). The ALJ noted that although Ms. Ruff stated in her function report that she has difficulty concentrating and could only pay attention for short periods of time, she engaged in activities which demonstrated she could pay attention for sustained

periods of time such as reading, watching television, paying bills, counting change, and handling savings and checking accounts. Id. (citing Exh. 8E). The ALJ also noted Ms. Ruff performed some household cleaning and laundry, reflecting at least some degree of concentration. AR15-16.

As to the final category, adapting or managing herself, the ALJ attributed mild limitations. AR16. Again, the ALJ set forth the regulatory definition: the ability "to regulate emotions, control behavior, and maintain well-being in a work setting. Examples include: responding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for yourself independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions." Id. (citing the Listings). In support of its attribution of a mild limitation, the ALJ pointed to Ms. Ruff's function report and hearing testimony in which she stated she has no problem taking care of her personal needs, but chooses to do them once or twice a week because of pain and lack of energy. Id. (citing Exh. 8E). Ms. Ruff also reported she has been able to avoid many hazards due to her seizure disorder and she could handle changes in her routine. Id.

The ALJ concluded Ms. Ruff also did not meet the "paragraph C" criteria of the Listings because the evidence did not show she was able to make only a marginal adjustment—a minimal capacity to adapt to changes in her environment or to demands not already a part of her life. Id. The ALJ noted no

state agency psychological consultant opined that Ms. Ruff met or equaled a mental Listing.  Id.

Before moving on to Step Four, the ALJ noted that evaluation of the "paragraph B" criteria does not constitute a formulation of residual functional capacity (RFC).  Instead, mental RFC would be evaluated at Steps Four and Five using a more detailed assessment.

### 4.    Step Four

The ALJ determined that Ms. Ruff had the RFC to perform:

> less than a full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b).  She is able to lift and/or carry 20 pounds occasionally and 10 pounds frequently.  The claimant can sit up to 6 hours in an 8-hour workday and stand and/or walk for 4 hours in an 8-hour workday.  She can push/pull the same as she can lift and carry.  The claimant would need the option to use a single point cane when ambulating distances greater than 100 feet.  She can occasionally engage in postural activities, but should never climb ladders, ropes or scaffolds.  The claimant needs to avoid even moderate exposure to hazards, such as unprotected heights and dangerous machinery.  She should not be required to drive as part of her job duties.  The claimant is limited to simple, routine and repetitive tasks.

AR16-17.

The ALJ's subjective symptom finding was that Ms. Ruff's medically determinable impairments could reasonably be expected to produce the symptoms she alleged, but her statements concerning the intensity, persistence and limiting effects of her symptoms were not "entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."  AR18.

The ALJ considered the opinions of the state agency medical consultants and gave them "great weight" and generally adopted the limitations they noted, except the ALJ further limited Ms. Ruff's postural activities.  AR21.

The ALJ considered the opinions of the state agency psychological consultants and gave them "no weight."  AR21.

The ALJ considered the medical source statement completed by Ms. Ruff's treating physician, Dr. DeHaan, and gave it "little weight."  AR21. The ALJ gave Dr. DeHaan's opinions little weight because the ALJ asserted Dr. DeHaan was not treating Ms. Ruff's ankle issues "specifically and has merely provided the claimant with medication refills for her anxiety, depression and seizure medications as well as Lyrica for nerve-related pain."  The ALJ asserted Dr. DeHaan's opinions did not "account for the fact that she is able to balance and climb at least stairs or ramps on a limited basis while going about her day."  AR21.  The ALJ also asserted the manipulative and environmental limitations included in Dr. DeHaan's opinions were not supported by the record.  AR21.  The ALJ stated Ms. Ruff's left shoulder impairment was relatively new and under adequate control so it would have minimal impact on her ability to work and would not result in ongoing manipulative restrictions. AR21.

The ALJ considered the restriction to sedentary work given by Ms. Ruff's treating orthopedic specialist, Dr. Alvine, and gave it "little weight."  AR21.  The ALJ acknowleged Dr. Alvine treated Ms. Ruff's ankle issue, but asserted that

his restriction to a sedentary position was not a specific functional limitation, and instead the ALJ determined its own RFC adequately accounted for Ms. Ruff's ankle problems and pain. AR21.

The ALJ gave "little weight" to the medical source statement and opinions provided by Ms. Ruff's treating mental health counselor, Donna Aldridge, MA, who said Ms. Ruff was not capable of working. AR22. The ALJ noted Ms. Aldridge was not an acceptable medical source and asserted her assessments were not entirely consistent with her treatment notes. AR22. The ALJ explained it would have expected a recommendation to a psychiatrist or psychologist if Ms. Ruff's depression and anxiety were really as bad as Ms. Aldridge reported. AR22.

Based on the RFC determined by the ALJ, the ALJ found Ms. Ruff was not capable of performing her past relevant work as a data entry clerk. AR22.

The ALJ noted Ms. Ruff was 47 years old on the alleged onset date, a younger individual, but failed to note that prior to the decision date Ms. Ruff turned 50, defined as an individual approaching advanced age, or that she was 52 on the date of the decision. AR22.

At Step 5, relying on the testimony of a vocational expert, the ALJ found there was other work Ms. Ruff could perform including electronics worker, DOT# 726.687-010 with 40,000 jobs in the national economy and 1200 jobs in the four-state region of Minnesota, Iowa, North Dakota and South Dakota; and small products assembler DOT# 706.684-022, with 15,000-20,000 jobs in the national economy and 600-700 jobs in the same four-state region. AR23.

Ms. Ruff timely requested review by the Appeals Council and submitted evidence to the Appeals Council consisting of a letter from her treating counselor, Donna Aldridge, MA, LPC, QMHP, dated August 8, 2017, describing Ms. Ruff's difficulty functioning since 2016. AR72-73. The Appeals Council denied Mr. Ruff's request for review making the ALJ's decision the final decision of the Commissioner and asserted the new evidence submitted from Ms. Aldridge did not relate to the period on or before May 22, 2017, when the ALJ issued its decision. AR1-2.

## DISCUSSION

### A.    Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Minor v. Astrue, 574 F.3d 625, 627 (8th Cir. 2009). Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975). "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, and requires a scrutinizing analysis, not merely a rubber stamp of the [Commissioner's] action." Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (cleaned up).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence

supporting it.  Minor, 574 F.3d at 627.  The Commissioner's decision may not

be reversed merely because substantial evidence would have supported an

opposite decision.  Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993); Reed v.

Barnhart, 399 F.3d 917, 920 (8th Cir. 2005).  If it is possible to draw two

inconsistent positions from the evidence and one of those positions represents

the Commissioner's findings, the Commissioner must be affirmed.  Oberst v.

Shalala, 2 F.3d 249, 250 (8th Cir. 1993).  "In short, a reviewing court should

neither consider a claim de novo, nor abdicate its function to carefully analyze

the entire record."  Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000)

(cleaned up).

    The court must also review the decision by the ALJ to determine if an

error of law has been committed.  Smith v. Sullivan, 982 F.2d 308, 311

(8th Cir. 1992); 42 U.S.C. § 405(g).  Specifically, a court must evaluate whether

the ALJ applied an erroneous legal standard in the disability analysis.

Erroneous interpretations of law will be reversed.  Walker v. Apfel, 141 F.3d

852, 853 (8th Cir. 1998) (cleaned up).  The Commissioner's conclusions of law

are only persuasive, not binding, on the reviewing court.  Smith, 982 F.2d

at 311.

## B.    The Disability Determination and the Five-Step Procedure

    Social Security law defines disability as the inability to do any

substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than twelve

47

months.  42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is disabled.  This sequential analysis is mandatory for all SSI and SSD/DIB applications.  Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520.  The five steps are as follows:

**Step One**:  Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

**Step Two**: Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  If there is no such impairment or combination of impairments the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe.  Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 1520a.  This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three**: Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404.  20 C.F.R. § 404.1520(d).  If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry.  Bartlett v. Heckler, 777 F.2d 1318, 1320 n.2 (8th Cir. 1985).  This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work.  Heckler v. Campbell, 461 U.S. 458, 460, (1983).  If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four.  NOTE: The "special procedure" for mental impairments also

applies to determine whether a severe mental impairment meets or equals a Listing.  20 C.F.R. § 1520a(c)(2).

**Step Four**: Determine whether the applicant is capable of performing past relevant work (PRW).  To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC).  If the applicant's RFC allows her to meet the physical and mental demands of her past work, she is not disabled.  20 C.F.R. §§ 404.1520(e); 404.1545(e).  If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five**: Determine whether any substantial gainful activity exists in the national economy which the applicant can perform.  To make this determination, the ALJ considers the applicant's RFC, along with her age, education, and past work experience.  20 C.F.R. § 1520(f).

## C.    **Burden of Proof**

The plaintiff bears the burden of proof at steps one through four of the five-step inquiry.  Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a).  The burden of proof shifts to the Commissioner at step five.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000).  "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices."  Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999).  The burden shifting is "a long standing judicial gloss on the Social Security Act."  Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987).  Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."  Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

**D.      The Issues Presented on Appeal**

Ms. Ruff asserts the Commissioner erred by finding her not disabled

within the meaning of the Social Security Act.  She asserts the Commissioner

erred in four ways:

1.      The Commissioner's determination of Ms. Ruff's RFC is not
        supported by substantial evidence as to

        a.      the ALJ's evaluation of treating physicians' opinions
                on physical impairments; and

        b.      her mental impairments.

2.      The Commissioner failed to fully and fairly develop the
        record as to Ms. Ruff's mental impairments;

3.      The Commissioner did not carry her burden at Step 5 to
        identify occupations Ms. Ruff could perform based on
        substantial evidence; and

4.      The Commissioner failed to properly identify Ms. Ruff's
        severe impairments.

The Commissioner asserts substantial evidence supports the ALJ's

decision and the decision should be affirmed.  Because issues 1.b and 2 are so

closely related, the court combines its discussion of those issues in its analysis

below.

**E.      Whether the ALJ's Determination of Ms. Ruff's RFC is Supported by
        Substantial Evidence**

   **1.      The Law Applicable to Formulation of RFC**

Residual functional capacity is "defined as what the claimant can still do

despite his or her physical or mental limitations."  <u>Lauer v. Apfel</u>, 245 F.3d

700, 703 (8th Cir. 2001) (citations omitted, punctuation altered).   "The RFC

assessment is an indication of what the claimant can do on a 'regular and

continuing basis' given the claimant's disability.  20 C.F.R. § 404.1545(b)."

Cooks v. Colvin, 2013 WL 5728547 at *6 (D.S.D. Oct. 22, 2013).  The

formulation of the RFC has been described as "probably the most important

issue" in a Social Security case.  McCoy v. Schweiker, 683 F.2d 1138, 1147

(8th Cir. 1982), abrogation on other grounds recognized in Higgins v. Apfel, 222

F.3d 504 (8th Cir. 2000).

   When determining the RFC, the ALJ must consider all of a claimant's

mental and physical impairments in combination, including those impairments

that are severe and those that are nonsevere.  Lauer, 245 F.3d at 703; Social

Security Ruling (SSR) 96-8p 1996 WL 374184 (July 2, 1996).  Although the

ALJ "bears the primary responsibility for assessing a claimant's residual

functional capacity based on *all* the relevant evidence . . . a claimant's residual

functional capacity is a medical question."[6] Lauer, 245 F.3d at 703 (citations

omitted) (emphasis added).  Therefore, "[s]ome medical evidence must support

the determination of the claimant's RFC, and the ALJ should obtain medical

evidence that addresses the claimant's ability to function in the workplace."  Id.

(citations omitted).

---

[6] Relevant evidence includes:  medical history; medical signs and laboratory
findings; the effects of treatment, including limitations or restrictions imposed
by the mechanics of treatment (e.g., frequency of treatment, duration,
disruption to routine, side effects of medication); reports of daily activities; lay
evidence; recorded observations; medical source statements; effects of
symptoms, including pain, that are reasonably attributable to a medically
determinable impairment; evidence from attempts to work; need for a
structured living environment; and work evaluations.  See SSR 96-8p.

"The RFC assessment must always consider and address medical source opinions." SSR 96-8p. If the ALJ's assessment of RFC conflicts with the opinion of a medical source, the ALJ "must explain why the [medical source] opinion was not adopted." Id. "Medical opinions from treating sources about the nature and severity of an individual's impairment(s) are entitled to special significance and may be entitled to controlling weight. If a treating source's medical opinion on an issue of the nature and severity of an individual's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the [ALJ] must give it controlling weight." Id.

Ultimate issues such as RFC, "disabled," or "unable to work" are issues reserved to the ALJ. Id. at n.8. Medical source opinions on these ultimate issues must still be considered by the ALJ in making these determinations. Id. However, the ALJ is not required to give such opinions special significance because they were rendered by a treating medical source. Id.

"Where there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity." SSR 96-8p. However, the ALJ "must make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." Id.

When writing its opinion, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence. . . In assessing RFC, the adjudicator must . . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." Id.

Finally, "[T]o find that a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Reed, 399 F.3d at 923 (cleaned up); SSR 96-8p 1996 WL 374184 ("RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" for "8 hours a day, for 5 days a week, or an equivalent work schedule.").

Because the RFC formulation must be based on some medical evidence, the Commissioner's regulations as to how the ALJ must weigh medical opinions comes into play. Medical opinions are considered evidence which the ALJ will consider in determining whether a claimant is disabled, the extent of the disability, and the claimant's RFC. See 20 C.F.R. § 404.1527.[7] All medical opinions are evaluated according to the same criteria, namely:

---

[7] The regulation quoted above applies to all claims *filed* prior to March 27, 2017. Thus, 20 C.F.R. § 404.1527 applies to Ms. Ruff's claim because she filed it November 3, 2014. AR11. The Commissioner has promulgated a new rule applicable to evaluation of medical opinions, 20 C.F.R. § 404.1520c. This new rule applies to claims for disability benefits *filed on or after* March 27, 2017. The new rule is not applicable to Ms. Ruff's claim.

--whether the opinion is consistent with other evidence in the record;

--whether the opinion is internally consistent;

--whether the person giving the medical opinion examined the claimant;

--whether the person giving the medical opinion treated the claimant;

--the length of the treating relationship;

--the frequency of examinations performed;

--whether the opinion is supported by relevant evidence, especially medical signs and laboratory findings;

--the degree to which a nonexamining or nontreating physician provides supporting explanations for their opinions and the degree to which these opinions consider all the pertinent evidence about the claim;

--whether the opinion is rendered by a specialist about medical issues related to his or her area of specialty; and

--whether any other factors exist to support or contradict the opinion.

See 20 C.F.R. § 404.1527(c)(1)-(6); Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007).

"A treating physician's opinion is given controlling weight 'if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.' " House v. Astrue, 500 F.3d 741, 744 (8th Cir. 2007) (quoting Reed, 399 F.3d at 920); 20 C.F.R. § 404.1527(c). "A treating physician's opinion 'do[es] not automatically control, since the record must be evaluated as a whole.' " Reed,

399 F.3d at 920 (quoting <u>Bentley v. Shalala</u>, 52 F.3d 784, 786 (8th Cir. 1995)). The length of the treating relationship and the frequency of examinations of the claimant are also factors to consider when determining the weight to give a treating physician's opinion. 20 C.F.R. § 404.1527(c).

"[I]f 'the treating physician evidence is itself inconsistent,' " this is one factor that can support an ALJ's decision to discount or even disregard a treating physician's opinion. <u>House</u>, 500 F.3d at 744 (quoting <u>Bentley</u>, 52 F.3d at 786; and citing <u>Wagner</u>, 499 F.3d at 853-54; <u>Guilliams v. Barnhart</u>, 393 F.3d 798, 803 (8th Cir. 2005)). "The opinion of an acceptable medical source who has examined a claimant is entitled to more weight than the opinion of a source who has not examined a claimant." <u>Lacroix v. Barnhart</u>, 465 F.3d 881, 888 (8th Cir. 2006) (citing 20 C.F.R. § 404.1527); <u>Shontos v. Barnhart</u>, 328 F.3d 418, 425 (8th Cir. 2003); <u>Kelley v. Callahan</u>, 133 F.3d 583, 589 (8th Cir. 1998).

When opinions of consulting physicians conflict with opinions of treating physicians, the ALJ must resolve the conflict. <u>Wagner</u>, 499 F.3d at 849. Generally, the opinions of non-examining, consulting physicians, standing alone, do not constitute "substantial evidence" upon the record as a whole, especially when they are contradicted by the treating physician's medical opinion. <u>Wagner</u>, 499 F.3d at 849; <u>Harvey v. Barnhart</u>, 368 F.3d 1013, 1016 (8th Cir. 2004) (citing <u>Jenkins v. Apfel</u>, 196 F.3d 922, 925 (8th Cir. 1999)).

However, where opinions of non-examining, consulting physicians along with other evidence in the record form the basis for the ALJ's decision, such a

conclusion may be supported by substantial evidence. <u>Harvey</u>, 368 F.3d at 1016. Also, where a nontreating physician's opinion is supported by better or more thorough medical evidence, the ALJ may credit that evaluation over a treating physician's evaluation. <u>Flynn v. Astrue</u>, 513 F.3d 788, 792 (8th Cir. 2008)(citing <u>Casey v. Astrue</u>, 503 F.3d at 687, 691-92 (8th Cir. 2007)). The ALJ must give "good reasons" for the weight accorded to opinions of treating physicians, whether that weight is great or small. <u>Hamilton v. Astrue</u>, 518 F.3d 607, 610 (8th Cir. 2008).

**2.    Whether the ALJ Properly Evaluated the Opinions of Ms. Ruff's Treating Physicians**

**a.    The Parties' Arguments**

Ms. Ruff asserts the ALJ characterized Dr. DeHaan as not being Ms. Ruff's treating physician for her ankle pain. This, she asserts, ignores the lengthy records from Dr. DeHaan detailing his treatment of Ms. Ruff's ankle impairment. Ms. Ruff also assigns as error the ALJ's disregard of Dr. DeHaan's opinion that Ms. Ruff should never balance or climb ramps, stairs, ladders or scaffolds in a sustained, full-time work setting. Ms. Ruff points out that Dr. DeHaan's opinion was consistent with her treating orthopedic surgeon, Dr. Alvine, who opined on multiple occasions over a four-year period that Ms. Ruff should be restricted to sedentary work only and clarified that this meant she was not in a position to work on her feet. Finally, Ms. Ruff argues the ALJ erred when it disregarded Dr. DeHaan's opinion as to the manipulative restrictions imposed on Ms. Ruff due to her neck and shoulder impairments.

The ALJ gave great weight to the nontreating, nonexamining state agency physicians' opinions. But Ms. Ruff argues these opinions are contradictory. They purport to find Dr. Alvine's restriction of Ms. Ruff to sedentary work to be "reasonable," but then go on to opine Ms. Ruff can be on her feet 4 out of every 8 hours in a working day, which is inconsistent with Dr. Alvine's "reasonable" opinion that she should be off her feet. The state physicians never clear up this contradiction, nor does the ALJ. Furthermore, as Ms. Ruff points out, because the state agency physicians issued their opinions based on the state of the record as it existed prior to August, 2015, these physicians did not have the benefit of Dr. Alvine's repeated opinions after that date that Ms. Ruff should be restricted to sedentary work nor Dr. DeHaan's 2017 opinion as to RFC.

The Commissioner argues the ALJ was justified in rejecting Dr. DeHaan's opinion that Ms. Ruff should never climb stairs or ramps because she did in fact climb stairs and ramps on a limited basis in her activities of daily living. The ALJ properly rejected Dr. DeHaan's manipulative restrictions, according to the Commissioner, because of the paucity of support for those in the medical record. The Commissioner also asserts the ALJ properly rejected Dr. DeHaan's opinion that Ms. Ruff could not work around noise, environmental irritants, or weather conditions because there was no evidence in the record to support

these limitations.[8]  Finally, the Commissioner asserts Ms. Ruff's activities of daily living supported the ALJ's discounting of Dr. DeHaan's opinion.

The Commissioner also asserts the ALJ properly rejected Dr. Alvine's opinion that Ms. Ruff could only work at the sedentary level because Dr. Alvine's opinion lacked sufficient detail.  In addition, the Commissioner argues the ALJ's RFC which limited Ms. Ruff to four hours of standing and walking a day along with the option to use a single-point cane when walking greater than 100 feet adequately incorporated any functional restrictions Ms. Ruff suffers as a result of her ankle impairment.

### b.     The ALJ's Evaluation of Dr. Alvine's Opinion

Dr. Alvine did not render an opinion, as such, of Ms. Ruff's overall physical RFC.  He did, however, opine on several occasions over a period of time that Ms. Ruff should be restricted to sedentary work.  AR385, 821, 873, 834-35.   To the extent his opinion that Ms. Ruff should work only at the sedentary level was too general, Dr. Alvine clarified:  she was not in a position to work on her feet.  AR821.  Dr. Alvine's opinion continued to be that Ms. Ruff should not work on her feet even after her ankle replacement surgery.  AR821. Notably, she continued to have significant, chronic pain in her ankle throughout the records in the AR, even after her ankle was pinned (AR417), after her ankle was fused (AR832-33), and after her ankle was replaced

_____

[8] Ms. Ruff does not assign this as error on appeal so the court does not address it.  Even if Dr. DeHaan made a mistake in his opinion as to environmental conditions, that is not grounds to disregard other portions of his opinion which are supported in the AR.

(AR873). This chronic pain was supported by objective evidence such as swelling and tenderness to touch. AR873.

As noted above, the state agency physicians found Dr. Alvine's opinion to be "reasonable," but then went on to opine Ms. Ruff could work on her feet four hours out of an eight-hour workday, which is incompatible with Dr. Alvine's opinion she should not work on her feet at all. AR123, 125. The ALJ adopted the physical RFC set forth by the state agency physicians.

The ALJ never explained how the conflict between the state agency physicians' opinions and their view of Dr. Alvine's opinion was reconciled. The ALJ characterized Dr. Alvine's opinion as being too general, but never discussed his very specific opinion that Ms. Ruff should not work on her feet. The state agency physicians never treated or examined Ms. Ruff. Dr. Alvine did so repeatedly over a period of several years. There is nothing in the record to indicate the state agency physicians are specialists of any kind. Dr. Alvine is an orthopedic surgeon. Under the above-cited law, Dr. Alvine's opinion was entitled to controlling weight. The ALJ never explains why it was not given such weight in light of the totality of the evidence.

To be sure, there are hints at inconsistencies in the record. Dr. Alvine records at one point that Ms. Ruff had been exercising on a treadmill and he advised her to exercise in a no impact method. AR873. Ms. Ruff told her counselor she was working out at the gym multiple times in a period of weeks. AR846-48. At least some of this exercise was in the pool, but it is not known the nature of the rest of her activities.

59

In addition, the medical opinions of record do not address Ms. Ruff's artificial ankle. How is it that a mechanical joint produces pain? The ALJ never reconciles the evidence as a whole with the medical opinion of Dr. Alvine, but simply dismisses his opinion as "too general." This is insufficiently "good reason" for dismissing Dr. Alvine's opinion especially when he later included more specificity, he was a specialist, and he had a treating relationship with Ms. Ruff spanning several years. The court will remand for the ALJ to reassess Ms. Ruff's physical RFC and to reevaluate Dr. Alvine's opinion.

### c. The ALJ's Evaluation of Dr. DeHaan's Opinion

Dr. DeHaan filled out the standard Social Security physical RFC questionnaire, so his opinions were sufficiently specific. AR849-51. He, like Dr. Alvine, opined Ms. Ruff should be limited to standing or walking less than two hours of an eight-hour workday. AR850. The ALJ dismissed this opinion because Dr. DeHaan had "not been treating [Ms. Ruff's] ankle issues specifically and has merely provided [her] with medication refills for her . . . nerve-related pain." AR21.

Dr. DeHaan saw and treated Ms. Ruff numerous times for her ankle pain from 2012 through 2016. ARAR594, 569, 928, 930, 932, 934. Furthermore, Dr. DeHaan's opinion as to Ms. Ruff's ankle impairment is consistent with Dr. Alvine's opinion. Both are supported by objective measures of pain including observable swelling and tenderness to the touch. Under the above regulations, the ALJ should not have credited the state agency physicians'

opinions about the functional impact of Ms. Ruff's ankle over and above her treating physicians' opinions.

Dr. DeHaan also opined Ms. Ruff should never climb ramps/stairs or ladders/scaffolds, never balance, and only occasionally stoop, kneel, or crouch. AR850. The ALJ adopted Dr. DeHaan's opinion that Ms. Ruff should never climb ladders, ropes or scaffolds. AR16-17.

The ALJ did not specifically address climbing stairs in its statement of Ms. Ruff's physical RFC, though it held she could "occasionally engage in postural activities." AR16. In the body of its opinion, the ALJ stated Ms. Ruff could climb stairs because she performed this activity in her daily activities. AR21. There is no support for this assertion. Ms. Ruff never testified she climbs stairs in her daily activities. AR93-105. The ALJ never asked her if she had stairs in her home or had to climb stairs to get into her home. Id. She testified she shopped at Wal-Mart and the grocery store, but typically these stores do not require shoppers to negotiate stairs. Ms. Ruff stated in her function report that her ability to climb stairs was impacted by her ankle impairment. AR329. The court remands for a reevaluation of Dr. DeHaan's opinion as to the limitations imposed by Ms. Ruff's right ankle in light of this opinion and the record evidence as a whole.

As discussed in more detail below at section G.3 of this opinion, Dr. DeHaan imposed limitations on Ms. Ruff's reaching, handling, fingering and feeling. AR850. He opined she could do these "frequently" – 33 to 66 percent of the workday. Id. The ALJ was correct in rejecting any such

impairment.  There is no evidence in the record that Ms. Ruff's shoulder or neck conditions imposed any limitations on her ability to reach, handle, finger and feel.

**3.    Did the ALJ properly determine the limitations imposed by Ms. Ruff's mental impairments and did the ALJ properly develop the record as to mental impairments?**

**a.    Recap of AR Records Related to Mental Impairments**

The records show Ms. Ruff was taking Celexa (citalopram) for depression as early as September 16, 2011, 10 months before the alleged date of disability. AR688-89.  Her general practitioner, Dr. DeHaan, prescribed the Celexa for her.  Id.  One year later, after the accident, Ms. Ruff's neurologist changed her depression medication to Prozac (fluoxetine) out of concern that Celexa in combination with Tramadol, may have triggered Ms. Ruff's July 22, 2012, seizure.  AR595.  At that time, the neurologist continued Ms. Ruff's anti-seizure medication, Keppra, which had as a possible side effect depression.  Id.  Two months later Dr. DeHaan increased the dosage of Ms. Ruff's Prozac.  AR591.

Eight months later, Ms. Ruff saw both her neurologist and Dr. DeHaan, reporting worsening depression due to events involving her 11-year old son. AR581-83.  Her neurologist changed her seizure medication to Lamictal to avoid the depression side effect of her former medication, Keppra.  Id.  Dr. DeHaan then changed her depression medication from Prozac back to Celexa and recommended Ms. Ruff consider going to counseling.  Id.  She did not go.

A few weeks later, Ms. Ruff reported to Dr. DeHaan that her anxiety and depression were stable now.  AR578.  One month later she called in to report she had increased her dosage of Celexa and asked Dr. DeHaan whether he approved.  Id.

One month later on September 10, 2013, Ms. Ruff reported to Dakota Counseling for an intake interview.  AR477.  She stated anxiety was her number one problem, but also reported numerous depression symptoms.  Id.  She reported she was taking an anti-depressant prescribed by Dr. DeHaan, but stated she did not feel the medication was working to control her symptoms.  Id.  She denied any active suicidal thoughts, never considered a plan of suicide and stated she would not follow through on any such plans.  AR478-79.  Ms. Ruff was diagnosed with Major Depressive Disorder, recurrent, mild, with full interepisode recovery; and Generalized Anxiety Disorder.  AR479.  The intake record has two names at the bottom and no signature, so it is unclear which person rendered the diagnosis or whether both did.  Id.  The two names are Donna Aldridge, M.A., psychology intern; and Gennea A Danks, Ph. D., licensed psychologist.  Id.  After this intake interview, Ms. Ruff did not return to Dakota Counseling Institute until January 8, 2016, approximately two years and three months later.[9]

In October, 2013, one month after the Dakota Counseling intake interview, Ms. Ruff reported to her neurologist that her depression had

_____

[9] Ms. Ruff testified she went to a couple counseling sessions in 2013, but no records document this in the AR.

improved.  AR573.  Eight months later, June 16, 2014, she asked Dr. DeHaan to increase her Klonopin prescription because she had been experiencing a lot of stress in relation to her two sons.  AR568-69.  Dr. DeHaan declined to increase her dosage of Klonopin and stated she needed to go to counseling to address her stress or see a psychiatrist for other recommendations on psychiatric medications.  AR569.  As noted above, Ms. Ruff did not return to Dakota Counseling until January, 2016, 18 months after Dr. DeHaan made this recommendation.  She also did not see a psychiatrist.

The very next month, July 8, 2014, Ms. Ruff reported to her neurologist that her anxiety and depression were "fairly well controlled" with her medications.  AR566-67.  There are no treatment records for the next year documenting any complaints from Ms. Ruff about anxiety or depression.  On June 2, 2015, she reported to Dr. DeHaan that those conditions were worse.  AR928.  Her medications were continued unchanged.  Id.

She next discussed her anxiety and depression with Dr. DeHaan five months later on November 5, 2015, when she stated her depression and anxiety were doing well overall.  AR932.

Two months later on January 8, 2016, Ms. Ruff began counseling with Dakota Counseling.  AR836-848.  From January through September 13, 2016, Ms. Ruff saw Donna Aldridge, M.A., QMHP, a mental health clinician 13 times, or approximately once every three weeks.  Id.  Ms. Ruff expressed her symptoms of depression and anxiety and, at Ms. Aldridge's prompting, began going to the gym more frequently and setting other goals as well as using

stratagems to deal with her symptoms.  Id.  During this treatment period, a diagnosis of Post-Traumatic Stress Disorder (PTSD) was added to Ms. Ruff's prior diagnoses of Major Depression and Generalized Anxiety.  Id.  In addition, Ms. Ruff's counselor provided a detailed opinion regarding her mental impairments.  AR882-83.

In the midst of her counseling sessions, Ms. Ruff saw Dr. DeHaan again on April 21, 2016, and complained of increased anxiety.  AR934.  She asked Dr. DeHaan whether her difficulty with attention could be the result of Attention Deficit Hyperactivity Disorder.  Id.  Dr. DeHaan rejected her suggestion and surmised her problem paying attention was secondary to her depression and anxiety.  Id.  He changed Ms. Ruff's depression medication from Lexapro back to citalopram (aka Celexa).  Id.

The above treatment records demonstrate a long-standing problem with depression and anxiety for Ms. Ruff.  Those conditions were worsened when problems developed with her sons, but it is not fair to characterize her depression and anxiety as situational *arising out of* the difficulties with her sons as the Commissioner characterizes Ms. Ruff's mental impairments. Ms. Ruff was taking prescription anti-anxiety/anti-depression medications even before her car accident, which is the date of alleged onset of disability.

However, although Ms. Ruff's mental impairments are of long-standing duration, the record reveals that they were adequately addressed for long stretches of time simply by taking prescribed medications.  There was an eight-month period from November, 2012, to June, 2013, where Ms. Ruff neither

65

complained of symptoms nor sought treatment.  From June, 2013, to June, 2014, Ms. Ruff saw Dr. DeHaan and her neurologist six times and generally reported her mental symptoms to be stable and/or improved.  During this time frame in September, 2013, Ms. Ruff did an intake interview with Dakota Counseling, but apparently did not pursue counseling at that time.

In June, 2014, she asked for her Klonopin prescription to be increased and Dr. DeHaan refused because she was already taking a high dose.  AR569. Dr. DeHaan recommended she go to counseling or see a psychiatrist if her current medications were not controlling her symptoms.  Id.  Ms. Ruff did neither and, one month later, she reported to Dr. DeHaan that her mental symptoms were "fairly well controlled."  AR567.  Then she went an entire year (July 8, 2014, to June 2, 2015) without any reports of anxiety or depression, without seeking any care for those conditions, and without any change in her prescription medications or dosages.

In June, 2015, she reported her symptoms to be "worse," but Dr. DeHaan did not change any of her medications or dosages.  From June 2, 2015, to the end of 2015, she reported anxiety symptoms only once in a November 2, 2015, visit with Dr. DeHaan.  He changed her depression medication back to citalopram as a result.

The only time frame when Ms. Ruff assiduously sought and received mental health care on a regular basis was in the months leading up to the hearing from January 8, 2016, to September 13, 2016.  Though some of those records indicate Ms. Ruff was struggling with energy and, as a result,

struggling also with personal hygiene and getting out of the house, they also reflect her symptoms and functioning improved.  In July, she reported "feeling much better."  AR844.  On August 16, she reported she went to the gym and worked out three times in two weeks.  AR846.  On August 30 she reported she had attended the gym three times in the past week.  AR847.  And in her final counseling session on September 13 she reported going to the gym four times in two weeks.  AR848.

### b.  Mental Limitations Incorporated in the RFC

Ms. Ruff asserts the ALJ found her mental impairments (depression and anxiety) to be severe, but then rejected all medical evidence as to the *effects* of her mental impairments on her ability to function and made its own inferences about functional impact, primarily based upon the lack of treatment records from a psychiatrist or psychologist.  This, Ms. Ruff asserts, was error.

The only mental limitation in Ms. Ruff's RFC is that she is limited to simple, routine and repetitive tasks.  AR17.  The question presented is whether this limitation adequately expresses the functional limitations of Ms. Ruff's mental impairments.

The AR contains mental RFCs from the state agency psychologists and from Ms. Aldridge.  The state agency psychologist opined Ms. Ruff had mild restrictions in her daily activities, mild difficulties maintaining social functioning, and mild difficulties in maintaining concentration, persistence and pace.  AR136.  In reaching this opinion, the state agency consultant noted that at the time of her initial intake interview in September, 2013, at Dakota

Counseling, Ms. Ruff was administered the Folstein Mini-Mental State Examination (MMSE) and scored a 27 out of a possible maximum of 30, indicating no impairment at that time. AR479. The state consultant also recited on July 8, 2014, Ms. Ruff was administered the PHQ (Patient Health Questionnaire),[10] to determine her level of depression. AR566. She scored a 9, which is indicative of mild depression. Id. Finally, the state agency consultant noted the GAD (Generalized Anxiety Disorder)[11] test was also administered the same day and Ms. Ruff scored a 12, which was indicative of moderate anxiety. Id. As noted above, however, the state agency consultant issued its opinion in June, 2015, and there is evidence in the record that Ms. Ruff's mental condition was relatively functional until 2016 at which point her condition declined notably. AR882. In any event, Ms. Ruff is correct in asserting the ALJ gave no consideration to the state agency psychologist's opinion because he did not have the benefit of Ms. Ruff's 2016 counseling records. AR21.

The only opinion in the record regarding Ms. Ruff's mental impairments in 2016-17 is that of her counselor, Ms. Aldridge. Ms. Aldridge opined Ms. Ruff was unable to work, an ultimate question reserved for the ALJ. AR883; SSR 96-8p at n.8. But she also filled out a mental RFC form. AR884-86.

---

[10] The National Institutes of Health states the PHQ-9 is a self-administered test which scores each of the 9 criteria for depression set forth in the Diagnostic and Statistical Manual-IV with scores ranging from 0 (not at all) to 3 (nearly every day). The maximum score is therefore 27 (3 x 9) and the lowest score would be zero. See https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1495268/.

[11] The GAD is also a self-administered test with a maximum score of 21 and zero at the lowest end. AR566.

Ms. Aldridge opined Ms. Ruff was markedly limited in her ability to remember locations and work-like procedures and to understand, remember, and carry out detailed instructions. AR884. She opined Ms. Ruff was moderately limited in her ability to understand, remember, and carry out very short and simple instructions. Id.

Ms. Aldridge opined Ms. Ruff was markedly limited in her ability to maintain attention and concentration for extended periods, to perform activities within a schedule, to maintain regular attendance, to be punctual, to work in coordination with others without being distracted, to make simple work-related decisions, to complete a normal work week without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. AR885. Ms. Aldridge opined Ms. Ruff was moderately limited in her ability to sustain an ordinary routine without special supervision. Id.

As to social interactions, Ms. Aldridge opined Ms. Ruff was moderately limited in interactions with the general public, asking simple questions or requesting assistance, and the ability to maintain socially appropriate behavior including adhering to basic standards of neatness and cleanliness. Id. Ms. Aldridge opined Ms. Ruff was markedly limited in her ability to accept instructions, respond appropriately to criticism, and to get along with coworkers without distracting them or exhibiting behavioral extremes. Id.

Regarding adaptation skills, Ms. Aldridge opined Ms. Ruff was markedly limited in her ability to respond appropriately to changes in the work setting, to

69

travel to unfamiliar places or use public transportation, and to set realistic goals or make plans independently of others. AR886. Ms. Aldridge opined Ms. Ruff was moderately limited in her ability to be aware of normal hazards and take appropriate precautions. Id.

The ALJ gave "little weight" to Ms. Aldridge's opinion because she is not an acceptable medical source, but also because her opinion was not consistent with the notes from her counseling sessions. AR22.

Although the ALJ is correct that a counselor is not an "accepted medical source" under the Social Security regulations (20 C.F.R. § 404.1527), that does not mean opinions of counselors should be disregarded. Only "acceptable medical sources" are qualified to provide the evidence necessary to establish the *existence* of a medically determinable impairment. Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007). Likewise, only "acceptable medical sources" can provide medical opinions or be considered a treating source. Id.

According to 20 C.F.R. § 404.1527(f), however, the ALJ should have considered Ms. Aldridge's opinion using the same factors that are applied to other medical opinions as set forth above. The opinion of a source who is not an accepted medical source can outweigh the opinions from accepted medical sources if the nonaccepted source saw the claimant more often than an acceptable medical source, provided better supporting evidence and a better explanation for the opinion, and if their opinion is more consistent with the evidence as a whole. 20 C.F.R. § 404.1527(f)(1). The ALJ does not recognize this distinction in its opinion.

Nonaccepted medical sources cannot provide the claimant's diagnosis. But Ms. Aldridge did not do that here. Ms. Ruff was diagnosed previously with anxiety and depression by others who *were* acceptable medical sources.[12]

As for inconsistencies between Ms. Aldridge's counseling notes and her opinion, the ALJ simply notes that Ms. Ruff went to the gym and met with others regarding the welfare of her sons. AR22. This is not necessarily inconsistent with Ms. Aldridge's opinion. The ALJ also states that if Ms. Ruff had really been as depressed and anxious as Ms. Aldridge opined, the ALJ would have expected Ms. Aldridge to have referred Ms. Ruff to a psychologist or psychiatrist for treatment. AR22. This "referral" factor does not appear among the criteria the regulation directs the ALJ to consider unless it can be said to fall into the "any other factor" criteria.

All of the disability reports and function reports in the AR which the ALJ relied on in contradicting Ms. Aldridge's opinion are from 2015. AR298, 314, 324, 334, and 350. The only written information from Ms. Ruff from 2016 regarding her functioning appears in the "recent medical treatment" document and "recent medications" document, both submitted August 31, 2016. AR365, 367. In those documents Ms. Ruff describes her anxiety as "severe" and indicates she began seeing a counselor. Id.

At the hearing Ms. Ruff's lawyer described her mental limitations as "significant" and stated she had difficulties with activities of daily living,

---

[12] Ms. Aldridge did diagnose Ms. Ruff with PTSD, a diagnosis no other acceptable medical source established. The ALJ would, therefore, have been justified in disregarding the PTSD diagnosis. Sloan, 499 F.3d at 888.

grooming, sleeping all day, doing only microwave cooking, infrequently cleaning, shopping for groceries so as to avoid crowds, and nearly no social outlets, only a friend in a different city whom Ms. Ruff saw every 1 to 2 months. AR92. Ms. Ruff agreed with this statement of her limitations. AR93. She also testified to the same limitations in her own words. AR97-101.

The ALJ acknowledged Ms. Ruff's activities of daily living were fairly limited, but it wrote those limitations off as "self-imposed" rather than a legitimate result of her mental impairments. AR20. Ms. Ruff's description of her activities of daily living were congruent with, not inconsistent with, Ms. Aldridge's mental RFC opinion.

The court concludes reversal on the mental RFC issue is required. Ms. Ruff is correct in stating there really was no medical evidence supporting the ALJ's mental RFC. The ALJ gave no weight at all to the state agency consultants' mental RFC. AR21. The ALJ then gave "little weight" to Ms. Aldridge's opinion and dismissed Ms. Ruff's description of her daily activities as self-imposed limitations. AR20-21. The ALJ did impose a limitation on mental RFC to the effect that Ms. Ruff should be limited to simple, routine and repetitive tasks. AR17. But this takes account only of the attention/concentration part of the mental RFC rubric. The ALJ imposed no limitations related to persistence, pace, motivation, or attendance. But neither did the ALJ explain *why* there were no limitations in these areas.

Ms. Ruff points out that, at step three of the analysis, the ALJ found Ms. Ruff to be mildly limited in the following mental abilities: understanding,

remembering, and applying information; interacting with others; and adapting

or managing oneself.  AR15-16.  The ALJ found Ms. Ruff had moderate

limitations in concentrating, persisting, and maintaining pace.  AR15.  Yet

none of these limitations are found expressed in functional limitations in the

ALJ's RFC.  Ms. Ruff argues this renders the ALJ's opinion internally

inconsistent and requires reversal.

The Commissioner argues the step three and step four analyses are

separate and compartmentalized.  A finding of a limitation at step three with

regard to the listings need not carry over to the RFC analysis.  Both parties are

partially wrong.

As stated above, in formulating RFC, the ALJ must consider all of a

claimant's impairments, both those that are severe and those that are not.  A

finding at step three that a claimant has mental limitations does not "magically

disappear when the analysis moves to step four."  Gann v. Colvin, 92 F. Supp.

3d 857, 884 (N.D. Iowa 2015).  However, just because a limitation is found at

step three also does not mean there automatically must be a corresponding

functional limitation in the RFC formulated at step four.  Id.  Instead, the

limitations found at step three should be considered when formulating RFC,

but they do not "automatically translate into limitations on the claimant's

ability to work."  Id.  The question is whether substantial evidence in the record

as a whole supports the ALJ's RFC formulation.  Pelkey v. Barnhart, 433 F.3d

575, 577 (8th Cir. 2006).

The problems with the ALJ's mental RFC in Ms. Ruff's case are two-fold. The RFC must be based on some medical evidence and, because the ALJ (properly) disregarded the state agency consultants' opinions and gave only "little weight" to Ms. Aldridge's opinions, it is not clear what medical evidence— if any—supports the ALJ's RFC formulation. Second, the ALJ need not have taken the limitations it found at step three and incorporated corresponding functional limitations into the RFC at step four, but at a minimum, the ALJ needed to explain its RFC formulation. There is no explanation for why the limitations found at step three do not translate into functional limitations at step four. The ALJ also fails to explain how the limitation to "simple, routine, and repetitive tasks" incorporates the ALJ's findings as to Ms. Ruff's mental limitations.

In Howard v. Massanari, 255 F.3d 577, 582 (8th Cir. 2001), the state agency consultant found that Howard "often" had deficiencies of concentration persistence or pace. The court found that the ALJ's mental RFC limiting Howard to performing simple, repetitive, routine tasks adequately took the mental limitations into account. Id.

Similarly, the district court in Ge Xiong v. Colvin, 995 F. Supp. 2d 958, 988 (D. Minn. 2014), found the ALJ adequately accounted for the claimant's moderate limitations in concentration, persistence, and pace by limiting the claimant's RFC to performing routine, repetitive, and simple work.

But in both Howard and Ge Xiong, the limitations were based on medical opinion evidence. Here, the court must guess at what the ALJ relied upon in

74

arriving at Ms. Ruff's mental RFC.  Guesses do not constitute substantial evidence.

### c. Duty to Develop the Record

Both the ALJ and Ms. Ruff's attorney commented at the hearing on the relative paucity of mental health records in the administrative record. Ms. Ruff's then-attorney requested that the ALJ order a consultative mental examination.  The ALJ declined to order such an exam.  The the ALJ stated Ms. Ruff had "insurance" and, therefore, the opportunity to seek further treatment.  Ms. Ruff argues before this court that the ALJ did not fulfill its duty to fully and fairly develop the record.

The Commissioner argues the ALJ must only develop the record reasonably and that the ALJ in this case fulfilled that duty.  First, the fact that Ms. Ruff received minimal mental health treatment was an indication her mental impairments were not as limiting as she alleged.  Also, the fact Ms. Ruff declined a referral to a mental health professional which her general physician attempted to make was an indication that her mental impairments were not as severe as she suggested.  The Commissioner also argues the ALJ properly denied Ms. Ruff's request for a consultative examination.  A consultative exam may be ordered if the evidence is insufficient to evaluate an impairment, but if the evidence is consistent and indicates a nonsevere impairment, no exam need be obtained according to the Commissioner.  Here, the Commissioner argues, the evidence was sufficient and supported the ALJ's conclusion regarding Ms. Ruff's mental impairment.

Ms. Ruff counters that her treating physician never referred her to a mental health professional. The record, according to Ms. Ruff, is that she followed all recommendations made by her doctors.

The duty of the ALJ to develop the record—with or without counsel representing the claimant--is a widely recognized rule of long standing in social security cases:

> Normally in Anglo-American legal practice, courts rely on the rigors of the adversarial process to reveal the true facts of the case. However, social security hearings are non-adversarial. Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case. The ALJ's duty to develop the record extends even to cases like Snead's, where an attorney represented the claimant at the administrative hearing. The ALJ posses no interest in denying benefits and must act neutrally in developing the record.

Snead v. Barnhart, 360 F.3d 834, 838 (8th 2004) (citations omitted). See also Johnson v. Astrue, 627 F.3d 316, 319-20 (8th Cir. 2010) (ALJ has a duty to develop the record even when claimant has counsel). If the record is insufficient to determine whether the claimant is disabled, the ALJ must develop the record by seeking additional evidence or clarification. McCoy v. Astrue, 648 F.3d 605, 612 (8th Cir. 2011). However, this is true only for "crucial" issues. Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005).

The ALJ may exercise its duty to develop the record in numerous ways, such as requesting medical records in existence but not yet part of the administrative record. Another specific tool available to the ALJ to develop the record is the consultative exam—an exam at the Commissioner's expense with a professional of the Commissioner's own choosing. 20 C.F.R. § 404.1512(b)(2).

76

The Commissioner has promulgated regulations relating to the consultative exam. See, e.g. 20 C.F.R. §§ 404.1512(b)(2), 404.1518 – 404.1519j.

The ALJ "may" decide to purchase a consultative exam when the information the ALJ needs cannot be obtained from the claimant's medical sources and one of the following circumstances is present: (1) the additional evidence is not contained in the records before the agency, (2) the evidence cannot be obtained from the claimant's treating sources for reasons beyond the claimant's control, (3) highly technical or specialized knowledge needed by the ALJ is not available from treating sources, or (4) there is an indication the claimant's condition has changed in a way likely to affect the severity of the impairment, but the change in condition is not established in the records before the agency. See C.F.R. § 404.1519a.

The ALJ declined to order a consultative mental examination because Ms. Ruff had access to mental health care as evidenced by both her long-standing prescription relation and treatment with Dr. DeHaan and her counseling records. Therefore, the fact that there were not a lot of mental health records in the AR was an indication of the severity of Ms. Ruff's symptoms.

Ms. Ruff interjected at the hearing that her "insurance" was only Medicaid. Even if this was true, Ms. Ruff received access to a high level and quantity of medical care under Medicaid: she got her ankle pinned, then fused, then replaced; she received regular appointments with a neurologist for her seizures; she received multiple MRIs of her neck, shoulder, and ankle; she

received multiple steroid and lidocaine injections to her ankle and shoulder; she received physical therapy for her ankle; and, when she wanted it, she attended counseling sessions every 2 to 3 weeks. There are no notations in her many medical records that she ever encountered difficulties receiving treatment because of lack of payment or lack of insurance coverage.

The ALJ's power to purchase a consultative exam is discretionary—the regulation uses the word "may." 20 C.F.R. § 404.1519a. That discretion "may" be exercised in four situations: (1) the additional evidence is not contained in the records before the agency, (2) the evidence cannot be obtained from the claimant's treating sources for reasons beyond the claimant's control, (3) highly technical or specialized knowledge needed by the ALJ is not available from treating sources, or (4) there is an indication the claimant's condition has changed in a way likely to affect the severity of the impairment, but the change in condition is not established in the records before the agency. Id.

There were several years' of evidence of Ms. Ruff's mental impairments in the AR. There is no indication of significant missing records from any provider. Ms. Ruff's treating sources, Dr. DeHaan and Ms. Aldridge, gave their opinions in the AR, so this is not a case where the ALJ needed highly technical or specialized knowledge that was not available from treating sources.

However, there is some indication that Ms. Ruff's condition had suddenly changed. Her counselor, Donna Aldridge, stated that when she first saw Ms. Ruff for her initial intake interview in September, 2013, Ms. Ruff was "relatively functional." AR882. However, when Ms. Ruff returned to counseling

in 2016, Ms. Aldridge stated she "presented with a marked deterioration in her daily functioning." Id.

This is not a situation where records evidencing this change were absent in the AR. Ms. Ruff's 2016 counseling records and Ms. Aldridge's opinion evidence based on Ms. Ruff's then-condition were before the ALJ. Ms. Ruff's condition has been one of long-standing and has waxed and waned over time. There is an indication in the record that her mental functioning significantly changed in 2016. Furthermore, Ms. Aldridge opined regarding Ms. Ruff's mental RFC in March, 2017, more than a year after the initial decline in mental functioning was noted.

The ALJ failed to note or address the evidence that Ms. Ruff's mental condition significantly deteriorated in 2016-17. The ALJ also never considered whether Ms. Ruff may have become disabled as of 2016, rather than the date of onset alleged in her application.

Ms. Ruff cites Nevland v. Apfel, 204 F.3d 853 (8th Cir. 2000), for the proposition that it is reversible error for the ALJ not to order a consultative examination in her case. But Nevland is distinguishable. In that case, not one of Nevland's treating physicians was asked to opine on Nevland's mental or physical RFC, so the only evidence in the record were the opinions of nontreating, nonexamining state agency consultants. Nevland, 204 F.3d at 858. The court held these consultants' opinions could not constitute substantial evidence in support of the ALJ's decision and remanded with

instructions to obtain opinions from Nevland's treating physicians or to purchase a consultative exam, including a psychological evaluation.  Id.

Here, there *is* evidence in the record from Ms. Ruff's treating counselor and from her general practitioner concerning her mental status.  The question is whether the ALJ properly evaluated that evidence and, if so, whether substantial evidence remains in the record to support the ALJ's decision.

Ordinarily, because of the discretion granted to the ALJ regarding ordering a consultative examination, the court would not reverse on this issue. Were the sufficiency of the evidence supporting the ALJ's evaluation of Ms. Ruff's mental impairments the only issue presented on appeal, it would be a close call whether this record warranted reversal.  However, the court has determined based on other issues discussed above that the decision of the Commissioner should be reversed and remanded.  Accordingly, upon remand, the court strongly encourages the ALJ to reevaluate the evidence regarding Ms. Ruff's mental impairments and mental RFC.  Should the ALJ find the medical evidence insufficient, the ALJ should consider ordering a consultative mental examination of Ms. Ruff.

## F.      Whether the ALJ's Step Five Determination Was Supported by Substantial Evidence

Ms. Ruff asserts that the ALJ failed to take into account the limitations imposed by her mental impairments in the hypothetical posed to the VE. Specifically, Ms. Ruff argues the ALJ included no limitations for concentration, persistence or pace, attention to detail, or for adapting and managing interactions with others.   Ms. Ruff also argues the ALJ never explained how

her mental functional limitations related to the hypothetical of being able to perform "simple, routine, and repetitive tasks." Because none of these limitations were included or explained in the hypothetical to the VE, Ms. Ruff argues the ALJ failed to carry its burden at step five to demonstrate there were jobs available in substantial numbers that Ms. Ruff could perform even given her impairments, severe and nonsevere.

As discussed above, the court is remanding this matter in order that the ALJ may reevaluate its RFC finding in light of a reassessment of treating physicians' opinions and all the evidence in the record. This may, of necessity, result in a new RFC, which would require a new hypothetical to a VE to determine whether there are any jobs Ms. Ruff can do. The court directs the ALJ to reevaluate its step five conclusion as well.

## G. Whether the ALJ Identified All of Ms. Ruff's Severe Impairments

### 1. The Parties' Arguments

Ms. Ruff asserts she has impairments in her neck and left shoulder that the ALJ should have identified as "severe" at step two, but did not. The ALJ found these impairments were medically determinable and that they could cause her symptoms, but never determined the severity of the impairments and never incorporated any limitations from the impairments in the RFC. The state agency physicians did not know about the neck and shoulder impairments because they issued their opinions in 2015 and the conditions did not appear until 2016.

Ms. Ruff also asserts she alerted the ALJ to the fact she had vision problems and expressed concern that there were no vision records in the record. The ALJ acknowledged there were no vision treatment records in evidence, but then did nothing to obtain them or inquire about them. Ms. Ruff argues both of these were errors on the ALJ's part.

The Commissioner notes that Ms. Ruff only sought treatment for her neck and shoulder problems twice, and never sought treatment after November, 2016. This, the Commissioner asserts, does not support any functional restrictions associated with Ms. Ruff's neck and shoulder impairments. Thus, the ALJ was justified in not including any functional restrictions in its RFC and in discounting Dr. DeHaan's opinion that such functional restrictions existed.

As to Ms. Ruff's alleged vision impairments, the Commissioner notes Ms. Ruff never asserted she suffered from any vision deficiencies until she heard the VE describe certain jobs at the hearing. Ms. Ruff stated at the hearing that her seizure medication affected her vision. The ALJ discounted this statement, rightfully according to the Commissioner, because Ms. Ruff never reported this side effect to any doctor and never sought any treatment for it. See AR579, 851, & 936.

## 2. The Law Applicable at Step Two

It is the claimant's burden to demonstrate a severe medically determinable impairment at step two, but that the burden was not difficult to meet and any doubt about whether the claimant met her burden is resolved in

favor of the claimant.  Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007);

Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001); and Dewald v.

Astrue, 590 F. Supp. 2d 1184, 1199 (D.S.D. 2008) (citing SSR 85-28).  An

impairment is not severe if it does not significantly limit the claimant's physical

or mental ability to do basic work activities.  See 20 C.F.R. § 404.1522(a).

Basic work activities include, but are not limited to:  walking, standing, sitting,

lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing,

speaking, use of judgment; responding appropriately to supervisors and co-

workers and usual work situations, dealing with changes in a routine work

setting, and understanding, carrying out, and remembering simple

instructions.  Id. at (b).

### 3.  Application of the Law to the Shoulder & Neck Issue

With regard to Ms. Ruff's left shoulder, there are only three medical

records in the AR.  First, on August 22, 2016, she reported she fell and injured

her left shoulder.  AR869-72.  This report of injury was accompanied by

objective evidence supporting an abnormality:  positive Spurling maneuver,

positive impingement reinforcement sign, and positive Hoffman sign.  Id.  An

MRI showed mild supraspinatus tendinosis and fluid in the subacromial space,

leading to the possibility of bursitis.  Id.

On October 7, 2016, Ms. Ruff received a lidocaine injection which gave

her relief of her shoulder pain for several hours.  AR867, 881.  On November 2,

2016, she returned for a repeat lidocaine injection.  AR864, 866, 878.  There

are no other records before August, 2016, or after November, 2016, regarding

Ms. Ruff's left shoulder. She appeared before the ALJ for her hearing on April 4, 2017. If her left shoulder was still impairing her daily activities with either pain or lack of function, it would be reasonable to assume there would be further treatment records in the five months between November 2, 2016, and the hearing on April 4, 2017. There were no such records.

Dr. DeHaan filled out a check-the-box physical RFC form for Ms. Ruff. AR840-851. Regarding her ability to push and pull, he stated she was unlimited. AR850. He stated she could "frequently" reach in all directions, handle, finger, and feel. Id. Dr. DeHaan limited Ms. Ruff to lifting and carrying 10 pounds or less, but this appears to be based on her ankle issues, not her shoulder issues. AR102.

It should be noted that Dr. DeHaan never treated Ms. Ruff for her shoulder. Dr. Alvine saw her once for the shoulder, and Dr. Peterson saw her on the other two occasions to administer the lidocaine injections. Neither Dr. Alvine nor Dr. Peterson opined that Ms. Ruff's shoulder injury was permanent, severe, or impacted her functioning at all. Ms. Ruff testified at the ALJ hearing that she suffered rotator cuff damage, but the MRI of her shoulder specifically rules out any involvement of the rotator cuff. Compare AR96, with AR860. The court concludes that the ALJ did not err in finding Ms. Ruff's shoulder impairment to be nonsevere.

The AR contains only one treatment record wherein Ms. Ruff complained of any neck pain. This was on December 1, 2016, when she saw Dr. DeHaan. AR936. Dr. DeHaan never addressed her complaint in the treatment record.

Id.  In the four months between this December, 2016, treatment record and the ALJ hearing in April, 2017, Ms. Ruff never complained of neck pain in any medical treatment record in the AR.

Two other records in the AR describe MRIs of Ms. Ruff's cervical spine. The day after her motor vehicle accident, July 23, 2012, an MRI of her neck showed mild disk protrusion at the C6-C7 level with no evidence of spinal stenosis or neural forminal stenosis.  AR674, 755.  A second MRI taken four years later in 2016 showed the same condition in Ms. Ruff's neck.  AR858, 869. During the intervening four years, Ms. Ruff did not complain of neck pain or seek treatment for neck pain, thus leading to the conclusion the condition, while objectively verifiable, was stable and asymptomatic.  There are no medical opinions in the AR of functional limitations stemming from Ms. Ruff's cervical spine condition.  The ALJ did not err in finding Ms. Ruff's neck condition was nonsevere and imposed no functional restrictions.

Ms. Ruff argues the fact that the ALJ found her neck and shoulder issues to be nonsevere impairments at step two means there should be some manipulative limitations reflected in the ALJ's physical RFC.  As discussed above, that is not the law.  The RFC must be supported by substantial evidence in the record as a whole and limitations found at prior steps of the five-step analysis do not necessarily translate into functional restrictions at step four. Gann, 92 F. Supp. 3d at 884.

Ms. Ruff accuses the ALJ of "playing doctor" by inferring the significance of findings from raw medical data itself.  The court does not see the ALJ's

opinion in that light. Rather, Dr. DeHaan who never treated Ms. Ruff for her shoulder issued a medical opinion with little, if any, manipulative limitations and Ms. Ruff did not describe manipulative limitations in her written statements or her oral testimony. She erroneously asserted she had a rotator cuff tear, but she described no functional limitations from her neck or shoulder conditions. And, as noted above, she sought no further treatment after her second lidocaine shoulder injection.

Ms. Ruff faults the ALJ for not requesting records from Core Orthopedics (the employer of Dr. Alvine and Dr. Peterson) to obtain records from November, 2016, to the April 4, 2017, hearing date. The court notes Ms. Ruff does not allege that there even *are* any such relevant records in existence nor does she inform the court what those records show if they exist. The court notes that current counsel represented Ms. Ruff after the ALJ hearing on appeal to the Appeals Council. Although counsel submitted new and material evidence for the Appeals Council to consider on appeal, counsel did not submit the Core Orthopedics records referenced now. AR72-73. In addition, there is a procedure for bringing new and material evidence before the district court too. See Mackey v. Shalala, 47 F.3d 951, 952 (8th Cir. 1995). Counsel for Ms. Ruff did not avail himself of this avenue either. The court concludes the records are either not relevant or do not exist.

### 4. Application of the Law to the Alleged Vision Issue

Finally, the ALJ also did not err in finding Ms. Ruff's vision condition to be nonsevere and that she suffered no functional limitations related to her

86

vision.  There is no indication in the AR at all—other than Ms. Ruff's impromptu statement at the ALJ hearing—that she suffers from any vision impairments.  Ms. Ruff initially testified at the hearing as to side effects from her medications and did not mention any vision impairments.  AR100.  Later, after hearing the VE testify to jobs she could perform, Ms. Ruff interjected that she suffered vision impairment as a side effect of her seizure medication, Topamax.  AR112-13.  There is no support for this anywhere in the record, either in medical documents or in Ms. Ruff's own statements about her impairments and the side effects of her medications.

Dr. DeHaan opined she had no visual impairments of any kind.  AR849-852.  In her function report, Ms. Ruff never reported any vision limitations.  AR329.  Furthermore, she reported that driving is her sole mode of travel when she goes out and that she drives twice a day during the school year.  AR325, 327.  If one had vision impairments, one would expect that to impact one's ability to drive or to obtain a license to drive.

In Ms. Ruff's seizure questionnaire, she was specifically asked if her seizure medications had any side effects.  AR315.  Ms. Ruff never asserted her medications caused any vision impairments.  Id.  At that time (February, 2015), her seizure medication was Lamotrigine.  Id.

On June 2, 2015, Ms. Ruff's seizure medication was changed from Lamotrigine to Topamax.  AR909.  She remained on Topamax through the date of the ALJ hearing.  She filled out an updated disability report on July 9, 2015, in which she indicated she was now taking Topamax.  AR335.  She was asked

about medication side effects and she did ***not*** indicate any vision impairments as a side effect of Topamax. AR339-40. Another updated disability report was submitted by Ms. Ruff on November 6, 2015. AR347. Again, although she was asked about side effects of medications, she did not indicate any vision impairment as a side effect of taking Topamax. AR347-48.

On August 31, 2016, Ms. Ruff submitted updated information about medications she was taking then and recent medical treatment she had received. AR365, 367. Again, she indicated she was still taking Topamax and she never indicated she had any vision impairments as a side effect of that drug. Id.

Current counsel for Ms. Ruff represented her at the Appeals Council level and, although new and material evidence relating to Ms. Ruff's mental condition was submitted on appeal, Ms. Ruff's vision records were not submitted. AR381.

Finally, there are no indications in her general physician's records, her orthopedic records, or her neurology records, that Ms. Ruff suffered vision problems independently or as a side effect of any of the medications she was taking other than the routine fact that she wears eyeglasses. In a doctor appointment as recently as December 1, 2016, she asserted she had had no recent changes in vision. AR936. Although vision impairment can be a potential side effect of Topamax, the side effect will be apparent within the first month of taking the drug. See https://www.webmd.com/drugs/2/drug-14494-6019/topomax-oral/details.

The ALJ did not fail to develop the record regarding vision impairments, the ALJ did not err in not identifying vision impairments as a severe impairment at step two, and the ALJ did not err in failing to include functional limitations related to vision in the RFC.

The court rejects Ms. Ruff's assertion that the ALJ erred at step two in failing to find her shoulder, neck and vision impairments were severe. The court denies Ms. Ruff's motion to reverse the Commissioner on this basis.

## H.    Type of Remand

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record. Ms. Ruff requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative, reversal with remand and instructions to reconsider her case.

Section 405(g) of Title 42 of the United States Code governs judicial review of final decisions made by the Commissioner of the Social Security Administration. It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands. A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling. Buckner v. Apfel, 213

F.3d 1006, 1010 (8th Cir. 2000). A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings. Id. Neither sentence six situation applies here.

A sentence four remand is applicable in this case. Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding." Buckner, 213 F.3d at 1011. In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings. Id.; Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be clarified and properly evaluated. See also Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability). Therefore, a remand for further administrative proceedings is appropriate.

**CONCLUSION**

Based on the foregoing law, administrative record, and analysis, it is hereby ORDERED that the Commissioner's decision is REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four.

DATED January 18, 2019.

BY THE COURT:

_____
VERONICA L. DUFFY
United States Magistrate Judge